HENDERSON et al.; Unkefer et al., Appellants,

v.

SPRING RUN ALLOTMENT et al., Appellees.

[Cite as *Henderson v. Spring Run Allotment* (1994), 99 Ohio App.3d 633.]

Court of Appeals of Ohio,
Ninth District, Wayne County.

No. 2892.

Decided Dec. 30, 1994.

634

*Charles A. Kennedy*, for appellants.

*Richard P. Gibbs*, *William Anfang* and *Michael G. Buytendyk*, for appellees.

REECE, Presiding Judge.

Appellants, Keith and Pamela Unkefer ("the Unkefers"), brought an action for damages against appellee, Spring Run Allotment ("Spring Run"),[1] for interference with the Unkefers' pipeline easement rights. The Unkefers' pipeline easement runs beneath property being developed by Spring Run for residential housing and, at the time of the complaint, was used by the Unkefers to discharge wastewater from their septic tank. Spring Run counterclaimed against the Unkefers for damages, alleging that the Unkefers had created a nuisance by

---

1. Spring Run Allotment is a general partnership which was formed by Steve Buss, Leann Buss, Weldon Buss, and Geraldine Buss to develop residential real estate. Spring Run and all of its partners were named as defendants in the court below and are appellees in this appeal. For purposes of our opinion, however, we will refer to Spring Run as appellee, although our decision applies equally to the individual partners.

discharging untreated wastewater or raw sewage onto Spring Run's property. After trial, the jury found against the Unkefers on their easement interference claim and found in favor of Spring Run on its nuisance counterclaim, awarding Spring Run $40,000 in damages. The Unkefers appeal. After reviewing the trial record, we affirm the judgment on the easement interference claim and reverse the judgment on the nuisance counterclaim.

The Unkefers own a home and residential lot fronting the north side of U.S. Route 250 in the village of Apple Creek. The Unkefers' lot was once part of a larger tract of land owned by Lawrence and Blanche Marthey. In the 1940s, the Martheys divided the larger tract of land. The Martheys sold several parcels as residential lots, which fronted the north side of Route 250, and sold another parcel as farmland, which abutted the rear of the Route 250 lots. The deed conveying the farmland contained easement rights granting the Route 250 lot owners the right to maintain drainage and sewer pipes under the farmland and to connect those pipes to a main drainage line that runs east and west under the farmland. When the Unkefers purchased their home in 1977, household waste was flushed into a septic tank on their lot. The septic tank then discharged the Unkefers' wastewater into a pipeline that ran north under the farmland and connected to the east/west drainage line.

In 1989, Spring Run purchased the farmland behind the Unkefers' property in order to develop it into residential lots. During excavation work on the farmland in the summer of 1990, Spring Run unearthed part of the Unkefers' wastewater pipeline. Spring Run traced the pipeline to the south boundary of its property near the Unkefers' property. Spring Run then connected a new pipeline to the existing source pipeline at the edge of the south boundary. However, Spring Run did not connect the destination end of new pipeline to the east/west drainage line. Instead, Spring Run left the destination end of the new pipeline open and uncovered on lot 297 of its development, where the pipeline discharged wastewater from the Unkefers' septic tank.

In November 1990, Spring Run filed a sewage nuisance complaint with the Wayne County Health Department, asserting that the Unkefers were discharging untreated wastewater or raw sewage onto Spring Run's property. At trial, the environmental health director for the county testified that the health department tested the wastewater and found it to be untreated or contaminated wastewater in violation of state health standards. The health director further testified that he advised Steve Buss, one of Spring Run's partners, not to reroute or connect the new pipeline to the original discharge destination. Although it is not entirely clear from the trial testimony, the health director apparently gave this advice because the original discharge destination, the east/west drainage line, flowed into a public watercourse.

From the very beginning of Spring Run's development, Spring Run, the Route 250 lot owners, and the village of Apple Creek clashed over whether the Route 250 lot owners could hook into the village sewer system via the sewer lines being constructed as part of Spring Run's development. Ultimately, the village had to construct its own sewer line on the south side of Route 250 for the benefit of lot owners on both sides of Route 250. In April 1993, apparently in contemplation of the Unkefers' eventually hooking into the village's Route 250 sewer line, the health director permitted Spring Run to connect the Unkefers' wastewater pipeline to the original discharge destination. Once the wastewater pipeline was connected to the original discharge destination, the pool of untreated wastewater that had accumulated on lot 297 was abated. Because the Unkefers' sanitary system is now connected directly to the village's sewer line, their septic tank is no longer used, and the wastewater pipeline on Spring Run's property is used strictly to discharge surface water runoff from the Unkefers' gutters and downspouts.

On April 15, 1993, the Unkefers filed a complaint against Spring Run, claiming that Spring Run had interfered with their easement rights. Spring Run counterclaimed, alleging that the Unkefers had created and maintained a nuisance on Spring Run's property. The case was tried to a jury on March 14, 15, and 16, 1994. The jury returned a verdict in favor of Spring Run and awarded Spring Run $40,000 in damages on its nuisance counterclaim. The Unkefers appeal, asserting twelve assignments of error.

We begin our analysis with the assignments of error addressing the easement interference claim. In their ninth assignment of error, the Unkefers claim that the trial court erred in failing to properly instruct the jury on the law concerning interference with easement rights. The trial court gave the following instruction:

"Now, because this is a particular kind of easement, it's a pipeline easement, its location is to be determined from the instrument that created it, Exhibit Q, the deed. In this case, the deed does not specifically or definitely locate the pipelines to be used. However, once the location of those pipelines has been determined, the owners of all properties involved in the easement *cannot modify or change the location without the consent or acquiescence of the other party or parties who have rights in the property,* rights either in the easement or in the property that is subject to the easement. And one who wrongfully interferes or obstructs in an easement is liable to the easement owner for damages caused by such interference or obstruction. If you find that the Defendant, Spring Run Allotment, wrongfully interfered with the easement rights of the [Unkefers] then you should return a verdict in favor of the [Unkefers] and then consider an amount of damages." (Emphasis added.)

The Unkefers do not contend that the trial court's instruction was wrong. Indeed, they acknowledge in their brief that the court's instruction was a correct statement of the law. Rather, the Unkefers claim that the court's instruction failed to give the jury all the law. Specifically, the Unkefers assert that in addition to the above instruction, the court should have instructed the jury that "[o]ne who changes, moves, or relocates pipes under a pipeline easement is also liable for damages."

A trial court is not required to give a proposed jury instruction in the precise language requested by its proponent, even if the proposed instruction states an applicable rule of law. Instead, the court has the discretion to use its own language to communicate the same legal principles. *Youssef v. Parr, Inc.* (1990), 69 Ohio App.3d 679, 690, 591 N.E.2d 762, 769. Moreover, if the court's instruction correctly states the law pertinent to the issues raised in the case, the court's use of that instruction will not constitute error, even if the instruction is not a full and comprehensive statement of the law. *Id.* Finally, the court has the discretion to refuse to give a proposed jury instruction if that instruction is either redundant or immaterial to the case. *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 148, 524 N.E.2d 881, 885–886.

We do not agree with the Unkefers' contention that their proposed instruction would have provided the jury with the complete law. The trial court specifically instructed the jury that "the owners of all properties involved in the easement cannot modify or change the location without the consent or acquiescence of the other party or parties who have rights in the property." The Unkefers' proposed instruction provided that "[o]ne who changes, moves, or relocates pipes under a pipeline easement is also liable for damages." It is clear that the Unkefers' proposed instruction states the same principle of law communicated by the trial court. Thus, it was within the court's discretion to use its own language to instruct the jury on that legal principle. Likewise, it was within the court's discretion to refuse to add the Unkefers' instruction because that instruction would have been redundant.

Finally, the Unkefers' proposed instruction does not even constitute a correct statement of the law. A party who changes, moves, or relocates pipes under a pipeline easement is liable only if the party does not have consent. The Unkefers' instruction does not include the consent limitation and, thus, does not correctly state the law. As a result, its addition to the court's instructions would have been misleading and would have served only to confuse the jury as to the issues in the case. See *State v. Williams* (1991), 75 Ohio App.3d 102, 116–117, 598 N.E.2d 1250, 1259–1260.

The ninth assignment of error is overruled.

In their twelfth assignment of error, the Unkefers contend that the jury's verdict on their interference-with-easement-rights claim was against the weight of the evidence. In reviewing the jury's verdict, we must adhere to the rule that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

The thrust of the Unkefers' argument centers on *Hollosy v. Gershkowitz* (1950), 88 Ohio App. 198, 201–202, 44 O.O. 221, 222–223, 98 N.E.2d 314, 315–316, in which the court held that if the location of an easement has been definitely determined by the owners of the dominant and servient estates, that location cannot be changed by either owner without the other's consent. The Unkefers contend the evidence adduced at trial clearly shows Spring Run changed the location of their pipeline easement without their consent. Thus, the Unkefers argue that the jury's verdict finding that Spring Run did not wrongfully interfere with their easement rights was against the weight of the evidence.

We first note that the deed granting the easement rights does not definitely describe the location of the pipeline easement. We further note that prior to Spring Run's unearthing the pipeline, neither party knew the actual location of the pipeline. Taken together, these facts raise doubts as to whether a rigid application of the rule in *Hollosy* is appropriate in this case. Nevertheless, even applying a strict construction to the rule in *Hollosy*, we find that the jury's verdict was not against the weight of the evidence.

■ Steve Buss, one of Spring Run's partners, testified that several days after the Unkefers' existing pipeline was unearthed, he connected a new wastewater pipeline to the existing pipeline and laid the new pipeline in a different location. Buss further testified that Keith Unkefer consented to this change in location or, at the very least, did not object when Buss told him Spring Run was going to move the pipeline. On cross-examination, though, Buss was less certain as to whether Keith Unkefer consented to the change in location. Keith Unkefer testified that he did not consent to the change in location and that he did not know Spring Run was going to move the pipeline.

■ It is a fundamental rule of appellate review that evaluating evidence and assessing credibility are primarily for the trier of fact. *Priebe v. O'Malley* (1993), 89 Ohio App.3d 8, 11, 623 N.E.2d 573, 575. Thus, a reviewing court will not secondguess the trier of fact's conclusions as to the weight and credibility of the evidence presented. *Id.* After evaluating the weight and credibility of the evidence presented in this case, the jury could have concluded that Keith Unkefer consented to Spring Run's changing the location of the wastewater pipeline.

Upon our own review of the evidence, we have found nothing that would compel us to secondguess such a conclusion.

Keith Unkefer also testified that since the pipeline has been moved, the gutters and downspouts on his house cannot handle the same volume of surface water runoff, resulting in the surface water bubbling up and collecting around the house's foundation. No evidence was presented, however, establishing that this surface water problem was the direct result of the new pipeline or its new location. Thus, on the evidence presented, the jury could have found that Spring Run did not cause the surface water problem.

Because the record contains competent, credible evidence supporting the jury's verdict that Spring Run was not liable to the Unkefers for interfering with their easement rights, the judgment of the trial court on that claim must be affirmed. The twelfth assignment of error is overruled.

In their tenth and eleventh assignments of error, the Unkefers claim that the trial court erred by failing to fully instruct the jury on the damages recoverable for interference with easement rights. Having already affirmed the judgment in favor of Spring Run on the easement-interference claim, any issues relating to damages on that claim are moot. The tenth and eleventh assignments of error are overruled.

We turn next to the Unkefers' eight assignments of error challenging the $40,000 jury verdict in favor of Spring Run on its nuisance counterclaim. In their fourth assignment of error, the Unkefers contend that the trial court should have directed a verdict in their favor on the nuisance counterclaim because Spring Run failed to prove damages as a matter of law. We agree.

In their briefs, both parties acknowledge that Spring Run was seeking to recover damages for a temporary injury to real property. As a result, both parties correctly cite *Reeser v. Weaver Bros., Inc.* (1992), 78 Ohio App.3d 681, 605 N.E.2d 1271, for the general rule of law used in measuring damages for that type of injury. The general rule provides that "a landowner whose real property has suffered a temporary injury is entitled to recover reasonable restoration costs, *plus the reasonable value of the loss of the use of the property between the injury and the restoration.*" (Emphasis added.) *Id.* at 691–692, 605 N.E.2d at 1278. The landowner's recovery, however, is limited by the rule that "the recoverable restoration cost cannot exceed the difference between the pre-injury and post-injury fair market value of the real property." *Id.* at 692, 605 N.E.2d at 1278.

On the facts, the *Reeser* court found that the plaintiff had presented no evidence of the preinjury and postinjury fair market value of her real property, and, thus, was not entitled to recover restoration costs to repair the temporary injury caused by the defendant's nuisance. The Unkefers argue that because

Spring Run failed to present evidence of its restoration costs or evidence of the preinjury and postinjury fair market value of its property, Spring Run was not entitled to recover damages. Spring Run agrees that it did not present the above evidence. However, Spring Run contends that even though it did not seek recovery for restoration costs, it was still entitled to seek recovery for the loss of the use of its property during the period the Unkefers' nuisance existed. On this issue, we agree with Spring Run.

The general rule of law set forth in *Reeser* explicitly provides for recovery of restoration costs and for recovery of the loss of the use of the property during the period the temporary injury exists. After reviewing the relevant authority on this issue, we have found nothing to indicate that recovery for loss of the use of the property is contingent upon pleading or proving restoration costs. Indeed, Section 929 of the Restatement of the Law 2d, Torts, clearly sets forth restoration costs and loss of the use of the property as separate and distinct types of damage, both of which are recoverable for harm to real property. 4 Restatement of the Law 2d, Torts (1979) 544, Section 929. Moreover, Section 929 does not contain any restriction providing that recovery for one type of damage is contingent upon pleading or proving the other. *Id.* at 546, Comment *d.*

The Restatement view is consistent with *Norwood v. Sheen* (1933), 126 Ohio St. 482, 186 N.E. 102, a case involving the temporary taking of real property for public use. In *Sheen,* the plaintiff sought to recover for the temporary loss of the use of her property due to the city of Norwood's discharge of sewage on her property. Restoration costs for the property were not an issue because the city's discharge of sewage had been abated prior to trial upon the installation of an adequate sewer system. The Supreme Court held that in the absence of restoration costs, the proper measure for damages caused by the city's temporary taking was the loss of the use of the property for the period during which the city was discharging the sewage. *Id.* at 493–495, 186 N.E. at 106–107. In so holding, the *Sheen* court expressly recognized that restoration costs and loss of the use of the property are separate and distinct types of damage and that the absence of one does not preclude recovery for the other. Based on this authority, we find that Spring Run was entitled to seek recovery for loss of the use of its property even though it did not seek recovery for restoration costs.

The next issue is whether Spring Run presented evidence of the damages it suffered due to the loss of the use of its property. As stated by the United States Sixth Circuit Court of Appeals, "[t]he plaintiff bears the burden of proving damages, and without adequate proof, there can be no award of damages in any amount." (Citations omitted.) *Grantham & Mann, Inc. v. Am. Safety Products, Inc.* (C.A.6, 1987), 831 F.2d 596, 601. Thus, to avoid a directed verdict, Spring Run had the burden to present evidence from which reasonable minds could

determine the value of the use of the property, and thus Spring Run's loss, for the period the property was injured by the Unkefers' nuisance. This burden required Spring Run to prove more than the fact that it was injured by the Unkefers' nuisance. Spring Run also had to prove that the damages it alleged were "the certain result of the wrong." *Id.* at 602. In determining whether Spring Run met this burden at trial, we are guided by the principle that "[t]he damages that result from an alleged wrong must be shown with reasonable certainty, and cannot be based upon mere speculation or conjecture, regardless of whether the action is contract or tort." *Wagenheim v. Alexander Grant & Co.* (1983), 19 Ohio App.3d 7, 17, 19 OBR 71, 82, 482 N.E.2d 955, 967.

To prove damages at trial, Spring Run relied exclusively upon the testimony of Steve Buss. Buss testified that Spring Run's residential development was intended to be constructed in at least three phases, with a loan being obtained for each phase to finance construction of the infrastructure, which included lot excavation and the construction of sewer lines, utilities, and roadbeds. The loan obtained for each phase would be repaid as each lot in that phase was sold. Further, a new phase would not be financed until the lending institution was satisfied that the loan on the previous phase could be covered by lot sales. Phase one was not adjacent to the Unkefers' property. Phase two included the property where the Unkefers' pipeline easement is located. Buss testified that Spring Run obtained a $210,000 construction loan with an eight and one-half percent interest rate for phase two.

As discussed earlier, Spring Run left the destination end of the new wastewater pipeline open and uncovered on lot 297, where it discharged untreated wastewater. At trial, Buss claimed that the pool of untreated wastewater which formed on lot 297 prevented Spring Run from selling that lot and the surrounding ten lots until April 1993, at which point the health director permitted Spring Run to connect the new pipeline to the original discharge destination. Buss testified to Spring Run's damages as follows:

"Q. As a result of the inability as you've testified to, to sell these lots, do you have any kind of a loss that you sustained?

"A. Interest.

"Q. The interest. Have you done any calculations to determine what your loss has been?

"A. Well, interest on the 11 lots at 14,500 per lot at eight and a half a year. A little over 13,000. I don't have the math in front of me, but a little over 13,600 or so a year. Three years, maximum would be some $40,000 in interest."

In *Sheen, supra,* the Supreme Court determined that "where injury to real property is temporary, the measure of damages, if the property be rented or held

for rent, is the diminution in its rental value during the continuance of the injury; but, if it be occupied by the owner, it is the diminution in the value of the use of the property during that period." 126 Ohio St. at 494, 186 N.E. at 106. Most of the Ohio cases we have reviewed are similar to *Sheen* and involve property owners who either rented or occupied the injured property. In this case, however, Spring Run's property was not held for rent or occupied by its owner but was held for commercial sale. In *Reeser, supra,* the plaintiff held her property for commercial use. However, the plaintiff did not "present evidence of lost profits, loss of rentals, or loss of use of the property she suffered by virtue of the nuisance," and thus the *Reeser* court did not have to address those issues. 78 Ohio App.3d at 685, 605 N.E.2d at 1273–1274. Consequently, Ohio case law does not provide clear guidance on the issue before us, *i.e.,* what is the proper measure of damages for the loss of the use of real property when that property is held solely for commercial sale?

Our research has found only one reported case directly addressing this issue. In *Hall v. Robbins* (Tex.App.1990), 790 S.W.2d 417, the plaintiffs purchased eighty-eight acres of land in 1981 for development into residential lots. In early 1982, the defendants, nearby property owners, began blocking the road that provided access to the eighty-eight acres, presumably to prevent the plaintiffs from developing the property. In 1987, the plaintiffs brought an action to enjoin the defendants from interfering with their access to the property. The plaintiffs also sought money damages for the period of time they were prevented from developing the property.

The only evidence of damages presented by the plaintiffs in *Hall* related to accrued real estate taxes, accrued interest on the purchase money mortgage, and loans to pay the taxes during the time the plaintiffs were excluded from the property. The trial court found that the amount of taxes and interest paid was not the proper measure of damages for the temporary injury. The trial court also found that there was no evidence presented of the value of the loss of the use of the property, which the trial court determined to be the correct measure of damages, and thus did not award any money damages. On appeal, the court of appeals affirmed, agreeing with the trial court that the amount of taxes and interest the plaintiffs had paid was not the proper measure of damages. *Id.* at 418. The court of appeals also agreed with the trial court that the plaintiffs had failed to present any evidence of loss of use and, therefore, were not entitled to damages. *Id.* at 419.

After carefully considering this issue, we agree with the *Hall* court that the amount of interest paid on real property held for commercial sale is not the proper measure of damages for a temporary injury to that property. This conclusion raises two questions. First, what is the proper measure of damages

for the loss of the use of property held for commercial sale? Second, under that measure of damages, did Spring Run meet its burden of proof? We will address these questions together.

This court has held that "[a] plaintiff may recover profits lost as a result of a defendant's tortious conduct if such damages may naturally be expected to follow from the wrongful act and if the damages are reasonably ascertainable." *Henry v. Akron* (1985), 27 Ohio App.3d 369, 372, 27 OBR 465, 468, 501 N.E.2d 659, 661. In *Henry*, the plaintiff's business was interrupted by an explosion and fire caused by the negligence of the city of Akron. At trial, the plaintiff presented evidence that the city's tortious conduct caused the injury to his business and also presented evidence establishing the amount of profits he lost as a result of that injury. Based on this evidence, the jury awarded the plaintiff money damages for lost profits. On appeal, this court affirmed, finding that the plaintiff had met his burden of proof and, therefore, was entitled to recover lost profits resulting from the interruption of his business. *Id.*

In this case, Spring Run purchased the property in question with the intent to improve the property into residential lots and to sell those lots for a profit. In effect, Spring Run was operating a commercial business selling residential lots. This business was interrupted by the Unkefers' tortious act of discharging untreated wastewater onto the property, which prevented Spring Run from selling eleven of its residential lots. Under these circumstances, we find that the proper measure of damages for the interruption of Spring Run's business is Spring Run's loss of profits on those eleven lots.

Buss testified that due to the pool of untreated wastewater, Spring Run was unable to sell the eleven lots from January 1991, when the lots were first available for sale, until April 1993, when the accumulation of wastewater was finally abated. We believe that Spring Run's loss of profits on the eleven lots could have been reasonably ascertained by comparing the profits Spring Run would have earned, had the eleven lots been sold by April 1993, with the profits Spring Run actually earned from selling the lots after the nuisance was abated. If the profits Spring Run actually earned were less than the profits it would have earned but for the nuisance, the difference between the two profit figures would equal Spring Run's lost profits.

 As a general rule, "[a] new business may establish lost profits with reasonable certainty through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts." *AGF, Inc. v. Great Lakes Heat Treating Co.* (1990), 51 Ohio St.3d 177, 555 N.E.2d 634, paragraph three of the syllabus. The only evidence Spring Run presented was Buss's testimony as to the amount of interest Spring Run paid on the eleven lots during the period

the wastewater pool existed. Under the *AGF* standard, that evidence, without more, does not constitute proof from which the trier of fact could find lost profits with reasonable certainty.

Finally, it is fundamental to the law of remedies that a party injured by wrongful conduct be made whole. *Collini v. Cincinnati* (1993), 87 Ohio App.3d 553, 556, 622 N.E.2d 724, 726. However, in making a party injured by wrongful conduct whole, the damages awarded should not place the injured party in a better position than that party would have enjoyed had the wrongful conduct not occurred. In this case, there is no evidence in the record suggesting that as a result of the Unkefers' nuisance, Spring Run was prevented from selling the eleven lots at a profit after the nuisance was abated. Thus, any damages awarded solely upon evidence of the interest Spring Run paid could result in a windfall because Spring Run would be recovering its interest costs as damages yet still be earning a profit on its original investment. Clearly, such a result would place Spring Run in a better position than it would have enjoyed had the Unkefers' wrongful conduct not occurred.

On the evidence presented, therefore, Spring Run's damages for the loss of the use of its property, *i.e.* its lost profits, could not have been determined with reasonable certainty. As a result, Spring Run failed to prove its damages as a matter of law. The Unkefers' fourth assignment of error is sustained.

Because of our disposition of the fourth assignment of error, we do not need to address the remaining assignments of error. The judgment of the trial court on the Unkefers' easement-interference claim is affirmed, and the judgment on Spring Run's nuisance counterclaim is reversed. The case is remanded to the trial court to enter judgment accordingly.

*Judgment affirmed in part*
*and reversed in part.*

BAIRD, J., concurs.

COOK, J., concurs in part and dissents in part.

COOK, Judge, concurring and dissenting.

I concur with the majority in affirming the judgment of the trial court on the Unkefers' easement-interference claim. I dissent from the reversal of the judgment on the counterclaim and would affirm the entire judgment.