DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Kimberly Nemeth, appeals from the trial court's entry of judgment on a jury verdict in favor of appellees, Ziya Celik, M.D. and The Toledo Clinic, and from the trial court's denial of a motion for new trial. For the reasons that follow, we affirm the decision of the trial court. *Page 2 
 {¶ 2} On October 27, 2003, appellant filed a medical malpractice and wrongful death action against appellees in connection with the treatment and care of her mother, Janna Gibson, by appellee Dr. Celik. Appellant alleged that Dr. Celik was negligent in: (1) obtaining Gibson's informed consent; (2) performing gastric bypass surgery on Gibson; and (3) caring for her post-operatively when she presented with complications following the surgery. Appellant alleged that Dr. Celik's negligence directly and proximately caused injury, including Gibson's death.
 {¶ 3} On November 7, 2005, this matter proceeded to a jury trial, where evidence of the following was adduced.
 {¶ 4} Janna Gibson was a 64-year old morbidly obese, diabetic female. On July 9, 2002, she presented to Dr. Celik's office for evaluation of her obesity. At that time, Dr. Celik performed a physical examination, reviewed her medical health and weight history, and discussed the bariatric surgical options that were available to her. He discussed the risks and benefits of the Roux-en-Y gastric bypass, in particular, and told Gibson that she was at high risk for complications if she elected to go through with the procedure. In addition to discussing the surgery and its implications, Dr. Celik gave Gibson a detailed booklet to review. The booklet specifically identified death, bleeding, and leakage as potential complications of the surgery.
 {¶ 5} Over the next three to four months, Gibson saw specialists in the areas of hematology, cardiology, pulmonology, and psychology in order to obtain medical clearance to undergo the gastric bypass procedure. Each specialist approved her for the *Page 3 
surgery. Gibson's hematologist, Brian Murphy, M.D., had treated Gibson in the past for idiopathic thrombocytopenic purpura ("ITP"), a low platelet count caused by the spleen's destruction of platelets. In providing his medical clearance, Dr. Murphy not only approved the bypass procedure, he also recommended that Gibson have her spleen removed during the same surgery in order to treat her ITP.
 {¶ 6} On November 11, 2002, one week prior to surgery, Gibson had a second office visit with Dr. Celik. At that time the surgery and its risks were again discussed, and Gibson signed a written consent form. The consent form specified that bleeding, infection, scarring, heart/lung complications, and injury to adjacent structures were among the risks of the procedure.
 {¶ 7} On November 19, 2002, Gibson was admitted to St. Charles Hospital and underwent the gastric bypass and splenectomy. The surgery went well, with no complications. The spleen was removed without difficulty. During the Roux-en-Y gastric bypass, a large portion of the stomach was bypassed with stapling, and a new small pouch, about the sized of a golf ball, was created just under the esophagus. The pouch was then connected to a part of the small bowel called the jejunum, forming a "Y" shape.
 {¶ 8} Gibson did well in the hospital following her surgery and she was discharged home on November 25, 2002 in good condition. She was active, there was no fever, and she was tolerating a liquid diet. Where before the surgery she was dependent *Page 4 
on insulin to control her diabetes, after the surgery, her diabetes improved to the point where she did not need to use insulin.
 {¶ 9} Gibson presented to Dr. Celik's office for follow-up on December 4, 2002, and was doing very well. The only complaint she had was constipation, which can sometimes occur following this surgery. Her abdominal wound was healing, and there was nothing coming from her drain to indicate a leak. Her staples, drain and G-tube were removed.
 {¶ 10} Late in evening on December 6, 2002, Gibson suddenly began to vomit blood. She was taken to Firelands Hospital and then, in the early morning hours of December 7, 2002, was transferred to St. Charles Hospital.
 {¶ 11} Before arriving at St. Charles, Gibson had had four episodes of vomiting blood. At 12:10 a.m., while she was in the St. Charles emergency room, Gibson vomited blood a fifth time, after being given ice chips. At this point, Gibson did not report having (or having had) any abdominal pain. Dr. Celik was contacted by an emergency room doctor and told about the vomiting. Gibson was admitted to the intensive care unit under Dr. Celik's care, with instructions that the nurse should contact him regarding ongoing problems.
 {¶ 12} At 4:15 a.m., Dr. Celik was contacted by the intensive care nurse, who told him that Gibson had vomited 200 cc more blood, that her hemoglobin had dropped from 11.4 to 9.2, that her white blood count was 24.2, and that she now had constant abdominal pain. The drop in the hemoglobin level indicated that Gibson was actively *Page 5 
bleeding, but the amount of bleeding was not dangerous. Dr. Celik believed the bleeding was most likely due to an ulcer that had formed at the site of the anastomosis (or connection of the jejunum and stomach), and that Gibson's abdominal pain was most likely due to the vomiting she was experiencing. Even appellant's expert, Dr. Carson Liu, acknowledged that the most common cause of bleeding days after a Roux-en-Y procedure is ulcer formation, and that ulcer formation can cause vomiting of blood and abdominal pain.
 {¶ 13} Dr. Celik treated Gibson medically by ordering blood transfusions with packed red blood cells, as needed, to replace the blood lost, IV Pepcid for the ulcer, and Phenergan to stop the nausea. In addition, he monitored her vital signs and hemoglobin and hematocrit levels.
 {¶ 14} For a number of reasons, Dr. Celik did not believe that Gibson's abdominal pain was due to a suture line disruption or leak, which would have required surgery. First, the evidence was undisputed that it would be unusual for a leak or breakdown of an anastomosis to develop 17 days after gastric bypass surgery. Second, an x-ray taken in the Firelands emergency room on December 6, 2002, showed no evidence of free air in the abdomen, which, if present, would have been indicative of a leak. Finally, there was no evidence of infection or changes in vital signs, both of which can indicate the presence of a leak.
 {¶ 15} Dr. Celik did not perform diagnostic tests of a gastrografin swallow, CT scan or endoscopy, because, in his opinion — and in the opinion of appellees' expert, *Page 6 
Latham Flanagan, M.D. — they were inappropriate and/or not indicated under the circumstances of Gibson's case. Dr. Celik did not perform an endoscopy because the new pouch was small, the scope was big, and the risk was too high that the endoscope would destroy the anastomosis that had been created. He did not order a gastrografin swallow because Gibson did not have any signs of an infection or leak and there was a risk of aspiration of material into the lungs from the test. Finally, Dr. Celik did not order a CT scan, because there were no signs of a leak and because the test is not indicated in a patient who presents with gastrointestinal bleeding from an ulcer.
 {¶ 16} At 7:00 a.m., on December 7, 2002, Dr. Celik was again called and was notified that Gibson was continuing to vomit, and now had blood in her stools. Dr. Celik testified that blood in the stools is not unusual when there is a bleeding site in the gastrointestinal tract, because blood is irritative to the bowel. In Gibson's case, in particular, the occurrence was not unexpected, because following surgery Gibson had a shorter small bowel than the normal person.
 {¶ 17} Notably, no further blood was ever noted in her bowel movements, suggesting that the bleeding had stopped or had been significantly reduced. Review of the nursing flow sheet likewise reveals that the amount of vomited blood had been decreasing since Gibson's admission. Gibson's vital signs continued to remain stable.
 {¶ 18} From 1:00 p.m. to 11:45 p.m., Gibson continued to vomit blood, but her episodes of vomiting became less frequent, and still she remained stable. (During her *Page 7 
entire hospitalization she required a total of only two units of blood.) A chest x-ray taken at 3:50 p.m. again showed no evidence of free air.
 {¶ 19} At 1:15 a.m. on December 8, 2002, Gibson was complaining of abdominal pain and was restless in bed and requesting pain medication. At 3:00 a.m., her complaints of abdominal pain continued, yet her vital signs remained stable.
 {¶ 20} Her vital signs continued to remain stable until approximately 4:45 a.m. on December 8, 2002. At that time, Gibson expressed that she was in pain and asked the nurse for help. Her pulse increased to 119 and her blood pressure dropped to 99/59. Dr. Celik was notified of the changes and gave orders to give an anti-anxiety drug to calm her and another transfusion of one unit of packed red blood cells. Twenty-five minutes later, at approximately 5:10 a.m., Gibson was found unresponsive in her bed and a code was called. Gibson was unable to be resuscitated, and at 5:46 a.m., she was pronounced dead.
 {¶ 21} Lucas County Deputy Coroner, Dr. Cynthia Beisser, performed an autopsy on Gibson and concluded that Gibson died of gastrointestinal exsanguination and tissue necrosis following a completely disrupted suture line from her gastric bypass surgery. According to Dr. Beisser, the bleeding occurred at the same time as the suture line disruption.
 {¶ 22} Appellees' expert, Dr. Flanagan testified that based upon his education, training, and experience, Dr. Celik met the standard of care in his care and treatment of Gibson — in particular, in the areas of informed consent, performance of the surgery, and post-operative treatment. Dr. Celik likewise provided expert opinion testimony and *Page 8 
testified that he met the standard of care in all respects regarding the care and treatment he provided in this case.
 {¶ 23} After six days of testimony, the jury returned a unanimous verdict in favor of appellees, both on the issue of informed consent and on the issue of negligence. Judgment was entered on the verdict on November 28, 2005.
 {¶ 24} On December 9, 2005, appellant filed a motion for new trial contending that the judgment was not supported by the weight of the evidence and was contrary to law. Appellees opposed appellant's motion. On February 14, 2006, the trial court issued an opinion and judgment entry denying the motion for new trial. On March 6, 2006, appellant timely filed her appeal, raising the following assignments of error:
 {¶ 25} I. "THE TRIAL COURT ERRED BY NOT DIRECTING A VERDICT FOR PLAINTIFF ON THE ISSUE OF INFORMED CONSENT OF DOING THE SPLENECTOMY DURING THE GASTRIC BYPASS."
 {¶ 26} II. "THE JURY VERDICTS WERE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 27} III. "THE TRIAL COURT ERRED FAILING TO GIVE THE ADDITIONAL JURY INSTRUCTIONS PROPOSED BY APPELLANT."
 {¶ 28} Appellant argues in her first assignment of error that the trial court erred when it refused to direct a verdict in her favor on the issue of informed consent regarding performance of the splenectomy at the same time as the gastric bypass. *Page 9 
 {¶ 29} An appellate court's review of the grant or denial of a motion for directed verdict is de novo. Gliner v. Saint-Gobain Norton Indus.Ceramics Corp., 89 Ohio St.3d 414, 415. In conducting this review, the appellate court must construe the evidence most strongly for the nonmoving party, and where there is substantial evidence upon which reasonable minds could reach different conclusions on the essential elements of the claim, the motion must be denied. Enderle v.Zettler, 12th Dist. No. CA2005-11-484, 2006-Ohio-4326, — 7.
 {¶ 30} As stated by the Ohio Supreme Court in Nickell v. Gonzalez
(1985), 17 Ohio St.3d 136: "The tort of lack of informed consent is established when:
 {¶ 31} "(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;
 {¶ 32} "(b) The unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and
 {¶ 33} "(3) A reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy." Id., at the syllabus.
 {¶ 34} Appellant argues that Dr. Celik exposed himself to liability in this case by failing to inform Gibson that undergoing a splenectomy simultaneously with a gastric bypass put her at increased risk. It was Dr. Celik's opinion, however, that the addition of *Page 10 
the splenectomy to the gastric bypass procedure did not put Gibson at increased risk. Moreover, it was both Dr. Celik's and Dr. Flanagan's position that the fact that the two procedures were combined did not lead to any complication at all, much less to Gibson's death.
 {¶ 35} This opinion is supported by the evidence. First, there is no evidence to suggest that the splenectomy caused the subsequent bleeding. Appellant's own expert opined that the cause of death was bleeding as a result of the breakdown of the suture line where the small intestine was connected to the upper part of the stomach. He additionally testified that the breakdown of the suture line was due to Gibson's poor wound healing, which was a result of her morbid obesity, her age, her diabetes, her prior use of steroids, and her gastric bypass. He did not testify that it was caused by the addition of the splenectomy to the gastric bypass procedure.
 {¶ 36} Construing the evidence most strongly in favor of appellees, we find that the motion for directed verdict was properly denied in this case. Accordingly, appellant's first assignment of error is found not well-taken.
 {¶ 37} Appellant argues in her next assignment of error that the jury verdicts were contrary to the manifest weight of the evidence with respect to appellant's claims for: (1) lack of informed consent; (2) negligent performance of the bypass procedure; and (3) negligent failure to respond to Gibson's bleed/anastomotic leak.
 {¶ 38} The law is well-established that "[judgments supported by some competent, credible evidence going to all the essential elements of the case will not be *Page 11 
reversed by a reviewing court as being against the manifest weight of the evidence." CE. Morris v. Foley Constr. Co. (1978),54 Ohio St.2d 279, syllabus.
 {¶ 39} With respect to the alleged lack of informed consent, we reiterate that the elements required to establish this tort are: (1) that the physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy; (2) that the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and (3) that reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy." Nickell v. Gonzalez (1985), 17 Ohio St.3d 136, at the syllabus.
 {¶ 40} Here, it is undisputed that Gibson died of gastrointestinal exsanguination and tissue necrosis following a completely disrupted suture line from her gastric bypass surgery. As indicated above, Dr. Celik testified that he discussed the risks of the surgery with Gibson and provided her with a written pamphlet that listed — among other potential complications — a risk of bleeding, leakage, and death. So too, the consent form that Gibson signed specifically listed bleeding as one of her risks. Dr. Celik also testified that he told Gibson that if she went through with the procedure, she was at high risk for complications. On the basis of this evidence, we conclude that there was competent, credible evidence to support the jury's verdict on appellant's claim for lack of informed consent. *Page 12 
 {¶ 41} Next, we consider appellant's claim regarding the jury's finding that Dr. Celik was not negligent in his performance of the bypass procedure. In arguing that Dr. Celik was negligent in performing the bypass, appellant cites affidavit testimony by Dr. Beisser wherein she states that upon autopsy, she found that Gibson's small bowel (jejunum) had been attached to her esophagus, and that her suture line had come undone. Drs. Celik, Flanagan, and Liu, all testified that connecting the jejunum to the esophagus was wrong, and would constitute a breach of the standard of care. On these grounds, appellant concludes that the jury should necessarily have found negligence on the part of Dr. Celik.
 {¶ 42} We note in this instance that a "coroner's factual determinations concerning the manner, mode and cause of death, as expressed in the coroner's report and the death certificate, create a nonbinding rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary." Vargo v. TravelersIns. Co. (1987), 34 Ohio St.3d 27, paragraph one of the syllabus.
 {¶ 43} Appellant, in making her argument that Dr. Celik was negligent, ignores abundant evidence suggesting that Dr. Celik did not, in fact, attach Gibson's jejunum to her esophagus. First, there was testimony by Dr. Celik himself, wherein he testified that he attached the jejunum to the small stomach pouch that he had created immediately adjacent to the distal end of the esophagus, not to the esophagus itself. (This testimony was supported by Dr. Celik's operative report, which was dictated on the day of the procedure and was transcribed the following morning.) *Page 13 
 {¶ 44} In addition, Drs. Celik and Flanagan each testified that the pouch, when correctly fashioned, lies immediately under the esophagus. According to testimony by Dr. Flanagan, when the procedure is finished, the jejunum is within approximately half an inch from the end of the esophagus. He further testified that if the pouch were to become necrotic to the point where it was no longer identifiable, it would appear that the esophagus was anastomosed to the jejunum.
 {¶ 45} Dr. Beisser herself acknowledged that all of the tissue in between the two ends of the esophagus and the jejunal end — including the small stomach pouch-likely became necrotic in this case, and, thus, were not able to be identified at autopsy. A reading of the coroner's report demonstrates that Dr. Beisser only indicated that the distal end of the esophagus appeared to be attached to the jejunum.
 {¶ 46} The above evidence constitutes competent, credible evidence that rebutted any presumption concerning the coroner's factual determinations, and, thus, allowed the jury to come to the reasonable conclusion that the "appearance" of the jejunum being anastomosed to esophageal tissue did not accurately reflect what Dr. Celik actually did in this case.
 {¶ 47} As stated above, the testimony of Dr. Flanagan at the time of trial was that Dr. Celik met the standard of care in the performance of the surgery, and this testimony was not overcome by the report of the coroner. Accordingly, we find that there was competent, credible evidence to support the jury's verdict on appellant's claim for negligence regarding Dr. Celik's performance of the bypass operation. *Page 14 
 {¶ 48} Finally, we examine appellant's claim regarding the jury's finding that Dr. Celik was not negligent with respect to Gibson's post-operative care. In particular, appellant argues that Dr. Celik was negligent in failing to order tests that were necessary to evaluate Gibson's bleed — in particular, a gastrografin swallow, an endoscopy, and/or a CT scan.
 {¶ 49} As indicated earlier, Dr. Celik evaluated Gibson and diagnosed her as having an upper gastrointestinal bleed that was likely due to an anastomotic ulcer. Dr. Flanagan testified that this was an appropriate and reasonable diagnosis. In addition, there was no evidence to suggest that Gibson had an anastomotic leak at the time of her presentation to the hospital.
 {¶ 50} Testimony by appellant's own expert, Dr. Liu, provided that it is unusual for a leak to occur more than 14 days after surgery, and that vomiting blood is not a finding one would expect to see with a leak. He further testified that the most common cause of bleeding after the first two or three days following a Roux-en-Y procedure is ulcer formation.
 {¶ 51} Dr. Celik's expert, Dr. Flanagan testified that no testing was indicated in this case, and that conservative, medical treatment was appropriate, because in most cases involving a mild to moderate bleed — as was at issue herein — the bleeding will stop on its own. The evidence showed that with Dr. Celik's treatment, Gibson was improving and stable up until the last minutes of her life, when she suddenly coded and could not be resuscitated. Based on the foregoing, we find that there was competent, credible *Page 15 
evidence to support the jury's verdict with respect to appellant's claim for negligence in connection with Gibson's post-operative care.
 {¶ 52} For all of the foregoing reasons, we find appellant's second assignment of error not well-taken.
 {¶ 53} Finally, we consider appellant's third assignment of error, wherein she claims that the trial court erred in failing to give the following additional jury instructions proposed by appellant:
 {¶ 54} 16. "A physician implicitly represents that he possesses that degree of learning and skill ordinarily possessed by members of his profession having due regard for advances in medical-surgical science at the time, and that he will use such learning and skill in the treatment of the patient with ordinary care and diligence. * * * A physician who holds himself out to be a specialist in a particular field of surgery must use his skill and knowledge as a specialist in a manner consistent with the special degree of skill and knowledge ordinarily possessed by other specialists who have devoted special study and attention to the same field of expertise, and in a manner consistent with the state of knowledge in the same field of expertise, at the time of the treatment."
 {¶ 55} 17. "If you find that Dr. Celik, in the exercise of the standard of care, knew or should have known that he did not have the requisite skill, knowledge or facilities to treat Janna Gibson's complications properly, or that a more favorable result would likely be obtained by a specialist, that a specialist was available; that defendant did not recommend the patient to a specialist or in the exercise of the standard of care did not do *Page 16 
o when it could have made a difference, and this failure to obtain the consult resulted in injury or death, you may find Dr. Celik negligent."
 {¶ 56} 18. "A surgeon's obligation to his patient is not automatically discharged upon completion of the surgery. A surgeon should continue until the threat of postoperative complications is ended or leave the patient with a responsible physician to ensure that proper treatment is administered.
 {¶ 57} "The surgeon has a duty to give a patient all the necessary care and treatment required and he should not leave the patient at a critical state without making suitable arrangements for the attendance of another physician specifically qualified to treat the patient for the particular complication presented.
 {¶ 58} "If you find that the surgeon failed to observe this duty, you may find he was negligent."
 {¶ 59} 20. "All surgery entails some risk. It is the duty of the surgeon to determine the risk to the particular patient and advise the patient of the nature and extent of those risks.
 {¶ 60} "The surgeon may have a duty to advise the patient she is at high risk for complications if the standard of care so requires.
 {¶ 61} "The performances of an additional procedure like a splenectomy, during gastric bypass surgery may involve increased risks about which the surgeon may need to advise the client if the standard of care so requires. *Page 17 
 {¶ 62} "The standard of care may require the surgeon advising the patient of a risk of bleeding and the nature and extent of the risk of death.
 {¶ 63} "You may consider these risks in determining whether Dr. Celik advised Janna Gibson of the material risks and obtained her informed consent."
 {¶ 64} 21. "Some of the expert medical testimony you have heard relates to matters outside the knowledge of laymen. To the extent expert testimony is uncontroverted or in agreement upon such matters as are outside the knowledge of laymen, you must accept such undisputed testimony as true and may not disregard it."
 {¶ 65} The law is clear that a trial court must charge a jury with instructions that are a correct and complete statement of the law,Marshall v. Gibson (1985), 19 Ohio St.3d 10, 12, but the trial court is not required to give jury instructions in the language proposed by the parties — even if the proposed instruction is an accurate statement of the law. Henderson v. Spring Run Allotment (1994), 99 Ohio App.3d 633,638. "Instead, the court has the discretion to use its own language to communicate the same legal principles." Henderson, supra. In addition, where a proposed instruction is either redundant or immaterial to the case, it is within the court's discretion to refuse to give that instruction. Bostic v. Connor (1988), 37 Ohio St.3d 144, 148.
 {¶ 66} Absent an abuse of discretion, this court must affirm the trial court's language of the jury instructions. Chambers v. Admr., Ohio Bur.of Workers' Comp., 164 Ohio App.3d 397, 2005-Ohio-6086, — 6. The term "abuse of discretion" connotes more than an error of judgment; rather, it implies that the trial court's attitude was arbitrary, *Page 18 
unreasonable, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. When applying the abuse-of-discretion standard, an appellate court may not substitute its judgment for that of the trial court. Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621.
 {¶ 67} In the instant case, the pleadings and evidence pertained to issues of medical negligence and lack of informed consent. A review of the instructions given demonstrates that the law related to these issues was fully presented to the jury. When appellant's proposed jury instructions are reviewed in connection with those instructions that were actually given, it is evident that they either were redundant of the instructions already included in the charge or were inaccurate statements of Ohio law.
 {¶ 68} For instance, a review of appellant's proposed jury instruction No. 16 reveals that it is merely a restatement of the jury instructions on the duties of a specialist that were presented to the jury by the trial court, and, thus, it is redundant.
 {¶ 69} Appellant's proposed jury instruction Nos. 17 and 18 deal with the standard of care of a physician, which was fairly and completely included in the jury instructions that were presented. Therefore, they, too, are redundant. The trial court's refusal to use appellant's language in this regard was reasonable and did not constitute an abuse of discretion.
 {¶ 70} Likewise, appellant's proposed jury instruction No. 20 deals with informed consent, which was specifically and adequately covered in the court's instructions to the jury. *Page 19 
 {¶ 71} Finally, appellants proposed jury instruction No. 21 requires the jury to regard expert testimony as true. Such a mandate is contrary to Ohio law, which clearly provides that the weight to be given to any testimony of any expert is at the sole discretion of the jury. Ace SteelBaling v. Porterfield (1969) 19 Ohio St.2d 137, 138; see also, Ross v.Smith, 1st Dist. No. C-030301, 2003-Ohio-7147, — 9. ("The jury is not required to accept medical evidence simply because it is uncontroverted, unimpeached, or unchallenged, and in weighing the evidence, the jury is entitled to believe all, part, or none of the testimony of any witness, including an expert.")
 {¶ 72} The court did not abuse its discretion in refusing to give appellant's proposed instructions. Accordingly, appellant's third assignment of error is found not well-taken.
 {¶ 73} For all of the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4. *Page 20 
Arlene Singer, J.
JUDGE William J. Skow, J., Thomas J. Osowik, J. CONCUR.