[Cite as *Benefits Evolution, L.L.C. v. Atlantic Tool & Die Co.*, 2011-Ohio-4062.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

BENEFIT EVOLUTION

      Appellee/Cross-Appellant

      v.

ATLANTIC TOOL AND DIE

      Appellant/Cross-Appellee

C.A. No.      25405

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.      CV 2008-09-6839

DECISION AND JOURNAL ENTRY

Dated: August 17, 2011

---

CARR, Presiding Judge.

**{¶1}** Defendant-Appellant/Cross-Appellee, Atlantic Tool & Die Company (hereafter "ATD"), has appealed from a decision of the Summit County Court of Commons Pleas that entered judgment in favor of Plaintiff-Appellee/Cross-Appellant, Benefits Evolution, on its claim for breach of contract. Benefits Evolution has filed a cross-appeal from the trial court's decision to award ATD damages on its counterclaim for breach of oral agreement. This Court affirms in part and reverses in part.

I.

**{¶2}** ATD is a mid-sized, worldwide manufacturing company. Benefits Evolution is a small company that operates as an insurance broker and administrator. In February 2007, ATD's Executive Vice President Mike Mehwald had lunch with Fred Jones. Mr. Jones, who was acting as an independent agent of Benefits Evolution, told Mr. Mehwald about a program offered by Benefits Evolution that would save ATD money on its health care costs. After their lunch

meeting, Mr. Jones emailed Mr. Mehwald with an outline of the health insurance plan offered by Benefits Evolution. In this email, Mr. Jones explained that one of the ways that Benefits Evolution is compensated is through a 25% fee of ATD's savings.

{¶3} In April 2007, Dave Ewonce, President of Benefits Evolution, had several meetings with ATD employees, including Mr. Mehwald and Ms. Jennifer Dumm, ATD's human resources partner. At these meetings, Mr. Ewonce explained Benefits Evolutions' "Smart Funding System," which "involves transitioning from a traditional fully funded insurance system to a high deductible, partially self-funded system." Mr. Ewonce testified that at these meetings, he told ATD about the various ways Benefits Evolution is compensated, including the Savings Fee.

{¶4} Through the Savings Fee, Benefits Evolution would receive 25% of ATD's savings for the 2007-2008 plan year. Mr. Ewonce explained that the savings are calculated by taking the renewal cost the customer would have paid by staying with its prior broker and deducting the actual costs the customer incurred during the first plan year with ATD. Mr. Ewonce testified that he told ATD at the meetings that the baseline number used in the Savings Fee calculations is based on the renewal figure. Mr. Mehwald told Mr. Ewonce that they would only agree to a 20% Savings Fee, rather than the usual 25%. Mr. Ewonce testified that despite already having the 25% Savings Fee in writing, Benefits Evolution "made the change to accept the 20."

{¶5} Ms. Dumm testified that ATD decided to explore a relationship with Benefits Evolution after receiving its $3.05 million renewal quote from its broker, Medical Mutual of Ohio (hereafter "MMO"), which was an increase of $600,000. On May 8, 2007, Mr. Ewonce emailed ATD copies of several agreements, including the Consulting Agreement. In this email,

Mr. Ewonce told Ms. Dumm that the baseline and percentage of savings calculations still needed to be added. According to the agreement, Benefits Evolution would become ATD's broker of record and implement its "Smart Funding System." Benefits Evolution would also serve as ATD's third-party claims administrator through a subcontract with ClaimLinx. In the compensation section of the Consulting Agreement, section 3.2 states that Benefits Evolution would be paid "a percentage of Employer's overall savings as a result of implementation of the Funding System, as more fully described in Attachment A hereto."

{¶6} ATD reviewed the Consulting Agreement, met with Benefits Evolution about it, and requested specific changes be made, to which Benefits Evolution consented. After the changes were made, Benefits Evolution was designated as ATD's broker of record in accordance with the Consulting Agreement on May 15, 2007. Mr. Ewonce sent a sample Attachment A on May 18, 2007, which demonstrated in detail, using a sample company, how the Savings Fee would be calculated. Mr. Ewonce testified that before the 2007-2008 plan year began, he provided ATD with their projected savings and the projected Savings Fee Benefits Evolution would expect.

{¶7} The 2007-2008 plan year began on July 1, 2007. ATD and Benefits Evolution had weekly meetings for the first few months of the plan year, but neither the Consulting Agreement nor Attachment A was ever discussed.

{¶8} ATD received Attachment A on July 22, 2007. Mr. Ewonce testified that this delay was for two reasons. First, Benefits Evolution had not determined who it was going to use for insurance. Second, Mr. Ewonce testified that Benefits Evolution "didn't have [the final MMO renewal] number solidified yet either, which we needed to calculate the baseline."

{¶9} Attachment A includes the actual Savings Fee calculation, which indicated a $3.0 million MMO renewal number as the baseline number. Ms. Dumm testified that she understood how the $3.0 million baseline number was derived. Ms. Dumm and Ms. Kathy Keating, ATD's office manager, reviewed the document and Ms. Dumm discussed it with Mr. Ewonce. Ms. Keating asked that a change concerning a "claims run-out period" in Attachment A be made. However, no one at ATD ever requested any changes be made to the Savings Fee calculation.

{¶10} Mr. Ewonce testified that in December 2007, Ms. Keating asked him how plan costs would change if they added or subtracted ninety people. Mr. Ewonce sent the sample calculations in February 2008, after the company had all the relevant numbers. In March 2008, Benefits Evolution fired ClaimLinx and began handling ATD's claims.

{¶11} Mr. Ewonce testified that when he met with Ms. Dumm, Ms. Keating, and Mr. Mehwald in June 2008, the Savings Fee that Benefits Evolution was expecting was discussed, and no one from ATD questioned it. Also in June 2008, Benefits Evolution and ATD agreed to continue their relationship. Benefits Evolution was designated as ATD's broker for the 2008-2009 plan year and started enrolling ATD's Ohio locations for the new benefits. However, shortly thereafter, ATD terminated Benefits Evolution and returned to its prior broker. Mr. Mehwald admitted that he did not inform Benefits Evolution that it was being terminated, even though he knew it was meeting with all the Ohio employees. ATD then asked Benefits Evolution to stay on for July 2008, even though the plan year ended. Benefits Evolution agreed, but ATD admits that it did not pay Benefits Evolution for that month.

{¶12} After ATD terminated Benefits Evolution, Mr. Ewonce demanded to be paid the Savings Fee as required by the Consulting Agreement. ATD refused and insisted it never agreed to the fee and that there was no contract. Mr. Ewonce testified that throughout their working

relationship, no one from ATD objected to the Savings Fee or the use of the MMO renewal quote as the baseline until Mr. Ewonce tried to collect the Savings Fee. Ms. Dumm admitted that August 2008 "may have been the first time [ATD] went back to BE and said we don't have a contract."

**{¶13}** Benefits Evolution calculated that ATD's total costs for the 2007-2008 plan year were $1,980,541.78. ATD thus had a "savings per associate of $3,760.49" by using Benefits Evolution rather than MMO. The savings per associate figure was multiplied by the average plan membership, which resulted in savings for ATD of $1,265,716.96. Thus, Benefits Evolution demanded 20% of these savings, which amounted to $253,143.39.

**{¶14}** Benefits Evolution filed a complaint against ATD alleging breach of contract, and, in the alternative, unjust enrichment. ATD denied these claims and counterclaimed for breach of oral agreement, negligent misrepresentation, and promissory estoppel. The case was tried to the bench in December 2009. The trial court entered judgment in favor of Benefits Evolution on its breach of contract claim and awarded damages of $261,724.68 for the Savings Fee and money owed for its July 2008 work. The trial court also awarded ATD $73,220.00 in damages on its breach of oral agreement counterclaim. The trial court also granted Benefits Evolution's motion for prejudgment interest on April 20, 2010, and found that Benefits Evolution was entitled to $14,791.16 in prejudgment interest. ATD filed a notice of appeal on May 19, 2010, after their first appeal was dismissed as premature, raising two assignments of error for review. Benefits Evolution filed its notice of cross-appeal on May 28, 2010, raising one assignment of error for review.

II.

## ATD'S ASSIGNMENT OF ERROR I

"THE TRIAL COURT ERRED IN ITS FINDINGS OF FACT AND CONCLUSIONS OF LAW THAT A CONTRACT EXISTED BETWEEN THE PARTIES."

### Manifest Weight

{¶15}  ATD argues that some of the trial court's findings of fact are against the manifest weight of the evidence.  ATD identifies five "critical errors" in the trial court's findings that it argues rendered an "unwarranted judgment" against it.

{¶16}  In determining whether the trial court's decision is or is not supported by the manifest weight of the evidence, this Court applies the civil manifest weight of the evidence standard set forth in *C.E. Morris Co. v. Foley Const. Co* (1978), 54 Ohio St.2d 279, syllabus, which holds: "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."  The Ohio Supreme Court has clarified that:

> "when reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80-81.   This presumption arises because the trial judge had an opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'  Id. At 80.  'A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court.  A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.'  Id. At 81."  *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, at ¶24.

{¶17}  The first error ATD alleges the trial court made is its finding of fact that "ATD, through its president Mike Mehwald, rejected the 25% savings fee [proposed by Benefits Evolution] and instead proposed a 20% savings fee. Ewonce agreed to the change."   Mr.

Mehwald admitted the discussion took place and that he discussed reducing the percentage, but claims the discussions were "theoretical[.]"  Mr. Ewonce testified that one of the ways that Benefits Evolution is always compensated is through its clients' "percentage of savings" and that he discussed this Savings Fee with Mr. Ewonce at their initial meetings in April 2007.  Mr. Ewonce testified that Mr. Mehwald told him "it would only be 20 percent" even though they had 25% in writing already.  Mr. Ewonce testified that they agreed to the 20% fee.  Mr. Ewonce further testified that, despite ATD's requesting changes to various aspects of the Consulting Agreement and Attachment A, ATD never objected to the 20% Savings Fee after it was specified in Attachment A and discussed on multiple occasions.  Based on the foregoing, we conclude that there is competent, credible evidence to support the trial court's conclusion that ATD, through Mr. Mehwald, rejected the 25% Savings Fee, agreeing instead to a 20% Savings Fee.

{¶18}  ATD's second alleged error concerns the trial court's finding that

"Ewonce indicated that he was using the prior year's MMO renewal numbers to calculate a baseline from which BE could determine the total plan savings.  There is no question that had ATD stayed with its prior vendor and paid for the plan it proposed, the quoted cost would be much higher."

ATD argues that if the trial court found that Mr. Ewonce was using the prior year's MMO numbers, then the baseline number should have been $2.4 million, not $3.0 million, since that was the cost of ATD's 2006-2007 costs.  Mr. Ewonce indicated several times that he would use the renewal cost, not the prior year's cost.  Mr. Ewonce further testified that one of the reasons for the delay in sending Attachment A was that he did not have the "final renewal" number from MMO yet.  Since Benefits Evolution and ATD already had the previous year's costs, it can be assumed that there would not have been a delay in sending the projected calculations if Benefits Evolution had planned on using that number.  Additionally, Mr. Ewonce sent a sample Attachment A to ATD in May 2008, which contained a calculation showing that the baseline

figure would be calculated based on the projected renewal figure. Lastly, Mr. Ewonce testified that Benefits Evolution told ATD "many times that we base [the baseline figure] on the renewal" and that ATD never objected until after the plan year ended. Accordingly, this Court cannot say that the trial court erred in finding that Mr. Ewonce indicated that he was using MMO's renewal figure of $3.0 million as the baseline for the Savings Fee calculation. Although the trial court's wording was ambiguous, it is clear from the rest of the court's findings in context that the court found that Mr. Ewonce indicated he was using the renewal number rather than the prior year's costs as the baseline.

{¶19} ATD further argues that "there was no evidence that ATD would have stayed with its prior vendor and paid the higher cost, as the court seemingly concluded." ATD asserts the evidence established that it would not have accepted MMO's renewal quote for the 2007-2008 plan year. However, Mr. Ewonce testified that the reason he used MMO's $3.0 million plan was because he "chose the number that matched the exact plans they wanted us to match" because ATD told him to match the plan "[i]n terms of benefits." Mr. Ewonce explained that ATD would not have received the same benefits it received from Benefits Evolution had it used one of MMO's less costly proposed plans for the 2007-2008 year. Thus, the trial court did not err in its conclusion that, had ATD stayed with MMO and paid for the plan proposed, its costs would have been much higher. Based on the foregoing, we conclude that there is competent, credible evidence to support the trial court's conclusion that Mr. Ewonce indicated he was using MMO's renewal figures and that, had ATD stayed with MMO, its costs would have been much higher.

{¶20} Next, ATD challenges the trial court's finding that it did not object to the Savings Fee calculation. ATD argues that Ms. Dumm questioned the proposal and that under the trial court's finding, "a contract would be formed in the absence of the party's objection, in stead (sic)

of actual consent and meeting of the minds." Ms. Dumm testified that she asked Mr. Ewonce questions about the Savings Fee in August 2007, and did not receive a response until February 2008. Ms. Dumm regularly met with Mr. Ewonce and never raised any questions or concerns regarding the Savings Fee after August, nor did she question it when receiving the February 2008 response. Mr. Ewonce testified that other than Mr. Mehwald's negotiation about the percentage used, ATD never objected to the Savings Fee payment method until after the plan year ended. Based on the foregoing, we conclude that there is competent, credible evidence to support the trial court's conclusion that ATD did not object to the Savings Fee.

**{¶21}** Next, ATD challenges the trial court's finding that "Ewonce testified that ATD did not question the baseline calculation until they first raised the issue in a December 2007 email from Kathy Keating. Her emailed (sic) queried the cost effect of adding employees." ATD argues that the referenced e-mail does not exist in evidence. ATD concedes, however, that "this is not significant in and of itself." ATD merely argues that the inclusion of this finding demonstrates the "tortured path the trial court took" in finding that ATD consented to a contract. We agree with ATD that the fact that this e-mail does not exist in evidence is insignificant because ATD still failed to provide any evidence that it objected to the baseline calculation other than Ms. Dumm's possible questioning in August. In her deposition, which was admitted into evidence since she passed away before trial, Ms. Keating admitted that she never told Benefits Evolution to use a different baseline. Furthermore, there is ample evidence to support the finding that a contract existed, as discussed in the next section. Based on the foregoing, we conclude that there is competent, credible evidence to support the trial court's conclusion that ATD did not object to the Savings Fee and that a contract existed.

**{¶22}** The final alleged error is ATD's claim that the trial court erred in its finding that ATD received Attachment A prior to the beginning of the new plan year. The evidence established that the new plan year began on July 1, 2007, and that ATD did not receive Attachment A until July 22, 2007. Thus, ATD did not receive Attachment A until after the new plan year began. However, this does not rise to the level of reversible error. ATD had received a sample Attachment A before the plan year began. ATD also received the contract and proceeded to enter into the plan year with Benefits Evolution knowing it had not yet received Attachment A. Mr. Ewonce provided legitimate reasons for the delay in sending Attachment A. Based on the parties' conduct and the reasons for the delay, we conclude that there is competent, credible evidence to support the trial court's conclusion that the delay in delivering Attachment A to ATD did not reflect "a lack of agreement between the parties."

**{¶23}** This portion of ATD's first assignment of error is overruled.

Enforceable Contract

**{¶24}** In this case, the parties agree that the contract was never signed. The primary issue is whether there was a meeting of the minds in regards to the Savings Fee term in order to give rise to an enforceable contract. ATD argues that there was no enforceable contract since there was no meeting of the minds. Benefits Evolution argues there was a meeting of the minds and that "ATD is bound by the terms of the Consulting Agreement."

**{¶25}** Whether a contract exists is a question of law. *Zelina v. Hillyer*, 165 Ohio App.3d 255, 2005-Ohio-5803, at ¶12. "A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik v. Helper,* 96 Ohio St.3d 1,

2002-Ohio-2985, at ¶16, quoting *Perlmuter Printing Co. v. Strome, Inc.* (N.D.Ohio 1976), 436 F.Supp. 409, 414. In order to have a valid contract, there must be a "meeting of the minds" as to the essential terms of the contract, such that "a reasonable person would find that the parties manifested a present intention to be bound to an agreement." *Zelina* at ¶12. A "meeting of the minds" is usually manifested by an offer by one party and acceptance by the other. *TLG Electronics, Inc. v. Newcome Corp.* (Mar. 5, 2002), 10th Dist. No. 01AP-821.

{¶26} Even though ATD did not signify its acceptance of the Consulting Agreement by signing it, this "does not necessarily result in its unenforceability." *Berjian v. Ohio Bell Tel. Co.* (1978), 54 Ohio St.2d 147, 152. "[W]here the relation between the parties justifies the offeror's expectation of a reply, such silence may constitute an acceptance on the part of the offeree." Id. In addition, "conduct sufficient to show agreement, including performance, is a reasonable mode of acceptance." *TLG Electronics, Inc.*, supra.

{¶27} This Court concludes that there was a meeting of the minds on the Savings Fee, and therefore, the Consulting Agreement is enforceable. The evidence reflects that ATD was aware of the Savings Fee term and agreed to it.

{¶28} The evidence demonstrates that Benefits Evolution was justified in believing that ATD had accepted the terms of the Consulting Agreement and Attachment A. Benefits Evolution sent both documents, albeit at different times, to ATD. ATD employees reviewed the documents, discussed them amongst themselves and with Benefits Evolution, and even requested changes be made to both documents. Benefits Evolution abided by the terms of all the agreements by performing its duties as ATD's broker for the 2007-2008 plan year. Except for paying the Savings Fee, ATD performed its duties for the plan year as well, including paying a $5,000.00 implementation fee as stated in the same section of the contract that discusses the

Savings Fee. Mr. Mehwald, even referred Benefits Evolution to other companies. Benefits Evolution and ATD agreed to continue their working relationship for the following year, before ATD abruptly terminated Benefits Evolution in June 2008. This conduct and performance on the part of ATD is sufficient to show its acceptance of the Consulting Agreement.

**{¶29}** Furthermore, the trial court did not err in finding that there was a meeting of the minds in regard to the Savings Fee. ATD was told several times during negotiations that one of the ways Benefits Evolution would be compensated would be through the Savings Fee, which would be calculated using ATD's renewal cost. Mr. Mehwald even negotiated with Mr. Ewonce to have the Savings Fee reduced from 25% to 20%. Benefits Evolution provided ATD with sample calculations and projections. The Consulting Agreement contained terms stating Benefits Evolution would receive the Savings Fee as part of its compensation. ATD received Attachment A in July 2007, which gave notice to ATD of all the numbers Benefits Evolution would use to calculate the Savings Fee. Mr. Ewonce testified that a reason for the delay was that Benefits Evolution was still waiting on the final renewal number from MMO, which would be used as the baseline for the calculation. ATD never requested any changes be made to any part of the agreement concerning the Savings Fee. ATD never voiced any objection to the fee until after the plan year ended. As ATD had been vocal about changes it wanted made to the Consulting Agreement and its incorporated attachments, Benefits Evolution was justified in believing that ATD's silence in respect to the Savings Fee term indicated its assent to the fee. Ms. Dumm even admitted that her understanding was that if Benefits Evolution saved ATD money, it was going to get a portion of the savings.

**{¶30}** ATD appears to argue that there was no enforceable contract as there was no agreement to Attachment A since the attachment came at a different time than the agreement.

However, this Court has held that a principle of construction for interpreting contracts is that "[w]here one instrument incorporates another by reference, both must be read together." *Christe v. GMS Mgt. Co., Inc.* (1997), 124 Ohio App.3d 84, 88. Since the Consulting Agreement referenced Attachment A, the two documents are considered one contract and must be read together. Furthermore, ATD was not silent as to Attachment A, as it requested changes to be made to it. The evidence establishes that ATD ratified and agreed to the entire contract, including the Savings Fee, through its conduct, and that it entered into an enforceable contract with Benefits Evolution.

Dismissal of Unjust Enrichment Claim

**{¶31}** Having found an express contract between the parties, the trial court dismissed Benefits Evolution's unjust enrichment claim. ATD argues that this Court should affirm the trial court's dismissal of that claim, but for a different reason. ATD argues that there was no express contract, so Benefits Evolution might have been entitled to unjust enrichment, but that it "did not establish the equitable claim of unjust enrichment at trial and is not entitled to such relief." However, this Court concluded that an enforceable and valid contract did exist. Accordingly, this portion of ATD's first assignment of error is rendered moot.

## ATD'S ASSIGNMENT OF ERROR II

"THE TRIAL COURT ERRED IN ITS CALCULATION OF DAMAGES AND AWARD TO BENEFITS EVOLUTION IN THE AMOUNT OF $253,143.39."

**{¶32}** ATD argues that "assuming *arguendo* that the parties did agree to the savings fee component of the Consulting Agreement, the trial court nevertheless erred in its calculation of damages with respect to the Savings Fee." In calculating the Savings Fee, the trial court used the $3.0 million MMO renewal figure as the baseline figure. ATD argues that the use of the $3.0

million figure was against the manifest weight of the evidence. ATD argues that the trial court should have used ATD's prior year's costs, which were $2.4 million, as the baseline.

{¶33} Under a civil manifest weight standard, as previously set out, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co.*, 54 Ohio St.2d at syllabus.

{¶34} Mr. Ewonce testified that he would never use the prior year's costs as a baseline, because companies come to Benefits Evolution looking to save money after their renewal costs have increased, which is how the Savings Fee exists. He explained that the $600,000 renewal increase that ATD was facing with MMO was the "driver" that brought it to Benefits Evolution. He testified that, during the initial meetings with ATD, he explained that the Savings Fee was calculated using the renewal figure, and that ATD never objected to this. Furthermore, Attachment A, which ATD received in July 2007, stated that the $3.0 million figure would be used in the Savings Fee calculation as the baseline figure. ATD did not present any evidence that it ever objected to the $3.0 million renewal figure throughout its relationship with Benefits Evolution.

{¶35} ATD points out that Benefits Evolution used the highest renewal figure available to ATD as the baseline and that ATD did not agree to that figure. Mr. Ewonce testified that he received multiple renewal quotes from MMO, but chose the highest quote as the baseline in the savings calculation, because that was the plan that Ms. Dumm told him to match "[i]n terms of benefits." Mr. Ewonce explained that the cheaper renewal plans would not have offered the same benefits that ATD received from Benefits Evolution.

{¶36} Based on a review of the record, this Court concludes that there was competent, credible evidence to support the trial court's finding that the $3.0 million figure was the baseline figure upon which ATD and Benefits Evolution agreed. Accordingly, the trial court's calculation of what ATD owed Benefits Evolution for the Savings Fee was not against the manifest weight of the evidence. ATD's second assignment of error is overruled.

### BENEFITS EVOLUTION'S ASSIGNMENT OF ERROR

"THE TRIAL COURT ERRED IN FINDING THAT ATD PROVED IT WAS ENTITLED TO $73,220.00 IN DAMAGES ON ITS COUNTERCLAIM."

{¶37} ATD counterclaimed for breach of oral agreement because Benefits Evolution failed to meet its service expectations and ATD employees had to spend time working on issues related to Benefits Evolution. The trial court awarded ATD $73,220.00 in damages. Benefits Evolution effectively argues that ATD's counterclaim award of $73,220.00 for breach of oral agreement should be reversed, as it was against the manifest weight of the evidence. This Court agrees.

{¶38} Under a civil manifest weight standard, as previously set out, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co.*, 54 Ohio St.2d at syllabus.

{¶39} "Generally, a breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the non-breaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the non-breaching party suffered damages as a result of the breach." *Bender Dev. Co. v. Streza*, 9th Dist. No. 03CA008397, 2004-Ohio-4576, at ¶10, citing *Garofalo v. Chicago Title Ins. Co.* (1995), 104 Ohio App.3d 95, 108. "A claimant seeking to recover for breach of contract must

show damage as a result of the breach." *Id.*, citing *Metro. Life Ins. Co. v. Triskett Illinois, Inc.* (1994), 97 Ohio App.3d 228, 235.

**{¶40}** The amount of damages awarded must correspond to injuries suffered as a result of the breach. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 144. The damages that result from an alleged breach of contract must be shown with reasonable certainty, and cannot be based upon mere speculation or conjecture. *Henderson v. Spring Run Allotment* (1994), 99 Ohio App.3d 633, 642. An injured party cannot recover damages beyond the amount that is established with reasonable certainty. *Textron*, 115 Ohio App.3d at 144. In this case, ATD failed to provide competent and credible evidence that it suffered damages with reasonable certainty.

**{¶41}** ATD did not provide competent evidence that it suffered damages as a result of a breach by Benefits Evolution. Ms. Dumm testified that ATD assessed all the damages to Benefits Evolution "regardless of who was to blame" for the claims processing problems. Benefits Evolution argues that this admission shows that ATD failed to prove that Benefit Evolution's breach caused ATD's damages. ATD argues that "regardless of the source of the error in the claims processing, Benefits Evolution was to handle the problem – not ATD." ATD never kept track of the cause of the problems and even admitted that its own employees might have caused some of the problems. ATD did not provide any evidence showing the amount of hours that can be attributed solely to Benefits Evolution.

**{¶42}** ATD also failed to establish with reasonable certainty the amount of damages it suffered. ATD merely argues that, despite the fact that no employee had to work extra hours to fix the problems, the company suffered "intangible loss" as resources had to be diverted from other projects. However, ATD did not submit any business records or detailed breakdowns of

time spent processing claims or projects from which its manpower was diverted. Rather, ATD simply provided a document which was created after the plan year had ended by employees who testified the documents were only estimates of the work performed. Ms. Keating admitted that she never kept a log of the amount of time she spent on work that should have been done by Benefits Evolution. Rather, Ms. Keating stated she kept track of the hours she spent working on the claims issue "[i]n my head" and determined what she thought was the average time. Ms. Dumm also testified that the hours used in the damages calculation were the "estimated time, that we've spent weekly on specific items related to BE." This method of calculating damages based on estimated time spent is very speculative. In addition, ATD even changed the amount it claimed it was damaged from $33,000 in July 2008, to $73,220 at the time of trial without providing any evidence explaining the increase.

{¶43} Based on the foregoing, there is no competent, credible evidence that a breach by Benefits Evolution resulted in damages awarded to ATD. Benefits Evolution's assignment of error is sustained.

III.

{¶44} ATD's two assignments of error are overruled. Benefits Evolution's cross-assignment of error is sustained. The decision of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and the cause remanded for further proceedings consistent with this decision.

Judgment affirmed in part,<br>
reversed in part,<br>
and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant/Cross-Appellee.

DONNA J. CARR
FOR THE COURT


WHITMORE, J.
CONCURS

DICKINSON, J.
CONCURS IN JUDGMENT ONLY


APPEARANCES:

JEFFREY M. EMBLETON and BRENDON P. FRIESEN, Attorneys at Law, for Appellant/Cross-Appellee.

OWEN J. RARRIC, Attorney at Law, for Appellee/Cross-Appellant.