[Cite as *FabMetals, Inc. v. Stratacache, Inc.*, 2024-Ohio-2006.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| FABMETALS, INC. | : | |
| Appellant | : | C.A. No. 29666 |
| | : | |
| v. | : | Trial Court Case No. 2018 CV 01339 |
| | : | |
| STRATACACHE INC. | : | (Civil Appeal from Common Pleas Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 24, 2024

. . . . . . . . . . .

JONATHAN R. SECREST & DAVID A. LOCKSHAW, JR., Attorneys for Appellee

PATRICIA J. FRIESINGER & DANIEL J. GENTRY, Attorneys for Appellant

. . . . . . . . . . . . .

LEWIS, J.

{¶ 1} Plaintiff-Appellant FabMetals, Inc. ("FabMetals") appeals from a judgment of the Montgomery County Court of Common Pleas, which awarded $3,575,059 to Defendant-Appellee Stratacache Inc. ("Stratacache"). For the following reasons, we will affirm the judgment in part, reverse it in part, and remand for a new trial solely to determine the amount of damages that Stratacache (1) already incurred to replace

defective menu boards; (2) will actually incur by September 2027 to replace defective menu boards; and (3) already incurred to investigate the cause of defective menu boards.

I.       Facts and Course of Proceedings

**{¶ 2}** FabMetals is a metal fabricator and painter of metal parts.  Stratacache is a company that offers digital signage solutions for various industries.  This appeal involves purchase orders that Stratacache sent to FabMetals in August and September 2017 for FabMetals to create and paint parts that would be used to assemble outdoor display menu boards intended for installation in the drive-thru lanes for quick-service restaurants like McDonald's.  Due to FabMetals' ability to both fabricate the parts and apply the requisite powder coating, Stratacache ordered several million dollars' worth of product from FabMetals in a relatively short amount of time.

**{¶ 3}** Powder coating uses a technology in which the coating is applied in powder form but ultimately looks similar to liquid coating.  When the powder coating is applied properly, a chemical reaction takes place leaving behind a hardened coating.  After a metal part is pre-treated to ensure that the part is clean, the powder coating is applied with electrostatic guns, which cause the powder to stick to the applied surface.  The surface is then exposed to heat in various forms to melt the particles into a coating that looks like paint.  The purpose of powder coating is to improve the appearance and delay corrosion of the item that was powder coated.  As such, powder coating is useful in protecting parts that will be subjected to arduous, outdoor environments.  Tr. 553-555.

**{¶ 4}** In September 2017, Stratacache was alerted by one of its menu board

assemblers that FabMetals had sent a few parts from which the powder coating was peeling off. After being informed of this, FabMetals assured Stratacache that appropriate steps would be taken to prevent this from happening again. Things then continued relatively smoothly between the parties for the next few months.

{¶ 5} In February 2018, however, a McDonald's location submitted a complaint to Stratacache that paint had peeled from the menu board it had purchased from Stratacache. After an investigation, Stratacache determined that 330 menu boards ordered from FabMetals likely had the same defect in the paint adhesion due to mistakes made in the cleaning and painting process at FabMetals.

{¶ 6} On March 23, 2018, FabMetals commenced an action against Stratacache in the Montgomery County Common Pleas Court seeking damages in the amount of $3,261,564.70 and alleging that Stratacache had failed to pay for parts and components that Stratacache had ordered from FabMetals. Stratacache filed an answer and counterclaim against FabMetals, alleging that defective work by FabMetals had caused Stratacache significant damages and that FabMetals had breached its contract and its implied warranty of fitness for a particular purpose.[1] Stratacache sought damages that were estimated to exceed five million dollars.

{¶ 7} On May 12, 2021, the parties entered into a stipulation regarding documentation of Stratacache's alleged damages. The parties stipulated that there would be no objection to the use of summary evidence under Evid.R. 1006 in lieu of submitting voluminous documents relating to the information contained in Trial Exhibits TTTT and

---

[1] At the beginning of the bench trial, Stratacache dismissed its claim for breach of the implied warranty of fitness for a particular purpose. Tr. 30.

UUUU. However, FabMetals reserved the right to object to the accuracy of the information, Stratacache's entitlement to damages, and any lack of foundation laid by Stratacache's witnesses at trial as to how the damages were calculated.

{¶ 8} On May 14, 2021, the parties also stipulated to the authenticity of documents and the amount and dates of Stratacache's payments to FabMetals on invoices for the outdoor display menu board project. The parties stipulated that Stratacache had paid $5,520,442.26 on invoices submitted to it between June 20, 2017 and February 2, 2018. The parties then stipulated to the authenticity of Stratacache purchase orders totaling $8,806,283.77. The stipulation also noted that "FabMetals shipped parts to Stratacache in the amount of $2,072,053.37 for which Stratacache has not paid FabMetals. FabMetals has in storage parts fabricated for Stratacache in the amount of $1,213,788.33 that it fabricated under Stratacache Purchase Orders."

{¶ 9} A bench trial was held from May 17-21, 2021. Several witnesses testified at the trial. Victor David Fritsch, the purchasing production manager at Stratacache, testified first. Tr. 31-230, 459-521, 684-703. Fritsch's job duties included purchasing products to include in the outdoor menu boards, purchasing tools to help build the boards, and forecasting how many units would be deployed to Stratacache's customers.

{¶ 10} Fritsch was hired in February 2017 to work on Stratacache's outdoor menu board project for quick-service restaurants like McDonald's. Fritsch coordinated with suppliers to make sure they could provide single and double menu boards to McDonald's for use in their outdoor drive-thru lanes. Fritsch described the project as follows:

The project was for outdoor signage or outdoor menu boards that

you would see in drive-thru lanes, many quick service restaurants. We were planning, deploying across the United States and eventually globally. They are the signs that are going to replace all the old fluorescent signs that you would see that you would order from. So they have a digital display inside of them so they can be changed month-to-month, or whatever specials you may have, easily through content rather than having to change out a plastic sheet that goes in front of the bulbs.

*Id.* at 32-33.

**{¶ 11}** Fritsch told all the potential suppliers for the project that the menu boards were for outdoor use. Representatives of FabMetals were unable to attend the bidding day at Stratacache, but two representatives of Stratacache went to FabMetals to explain what needed to be built. FabMetals had a good reputation and appeared to do high quality work. Mark Hensley, an employee of FabMetals, then visited Stratacache's facility. He lauded his company's success with a previous powder coating project for outdoor products. One of Stratacache's subsidiaries also recommended FabMetals to Stratacache.

**{¶ 12}** Stratacache chose FabMetals to provide the necessary fabricated and powder coated parts for the outdoor menu boards. Although Stratacache had another supplier, Armor, FabMetals quickly took over as the sole supplier for the outdoor menu board project due to FabMetals' willingness to deliver the necessary parts so promptly. FabMetals supplied both powder coated and non-powder coated parts for Stratacache to use on the menu board project. All the back panels for the boards were powder coated

parts. Such parts were more expensive than ones that were not powder coated. The powder coating protected the metal from the weather.

{¶ 13} Although there was no formalized written contract between the two parties, Stratacache sent purchase orders to FabMetals, which then submitted invoices for payment to Stratacache after the parts were delivered. This process repeated itself over several months without any incident. Over the first few months of the relationship, Stratacache considered FabMetals to be a good supplier with high quality, good prices, and prompt delivery. Stratacache continued to order more products, which caused FabMetals to hire additional workers and work longer hours to keep up with the demand.

{¶ 14} This outdoor menu board project started by Stratacache in 2017 was called the V10 project. It was a start-up line and was created by Ralph Idems, with whom Fritsch interacted a few times per week. By December 2017, Stratacache had decided to end the V10 product line and began producing a newer model. The V11 model of menu board had an outer shell made out of ABS plastic material rather than steel. The V12 is the current model of menu board, and it uses aluminum instead of steel.

{¶ 15} Stratacache used Civiq, a Canadian company, to assemble the outdoor menu boards after receiving the parts from FabMetals. In September 2017, Civiq alerted Stratacache that it had received some parts from FabMetals with paint peeling off them. Stratacache reached out to FabMetals to determine what had caused this "catastrophic" paint failure. Mark Hensley explained to Fritsch that the metal parts had not been washed properly and that oil in the water had prevented proper paint adhesion. An email from an employee at FabMetals explained that the contamination most likely had been caused by

excessive oil in the production line and keeping the production line running longer than normal to meet customer demand. FabMetals assured Stratacache that it would address the problem by cleaning the tanks and providing more quality control documentation on a regular basis. Stratacache accepted replacement parts from FabMetals to replace the defective parts identified by Civiq.

{¶ 16} Fritsch testified that, in February 2018, the first catastrophic paint failure in the field was reported by a McDonald's location. Stratacache shut down its operations in order to determine what had caused the failure. After a significant investigation, Stratacache discovered that all of the back panels on the menu boards had been made by FabMetals, and the cause of the paint failures was FabMetals' processes. Stratacache determined that it would need to replace all the menu boards that FabMetals had made for Stratacache from August 23, 2017 to September 15, 2017 (the "hot zone"). Because of how the menu boards were designed, the entire menu board had to be replaced even if the only failure was in the back panel. Stratacache determined that FabMetals had built and provided 330 menu boards to Stratacache during the 23-day hot zone.

{¶ 17} Once Stratacache determined that the paint failures were caused by FabMetals, Stratacache stopped paying invoices that it had received from FabMetals. A few dozen complaints from additional McDonald's locations were made to Stratacache over the next few years. Stratacache incurred significant expense in removing and replacing the defective menu boards.

{¶ 18} Fritsch testified regarding Stratacache's damages. He divided them up generally into five categories: 1) tooling costs for six teams; 2) field checks and

preparation; 3) retrieval costs; 4) cost to replace the metal; and 5) cost of downtime at Stratacache during the investigation into the cause of the catastrophic paint failure. He presented his damage estimates in spreadsheet form. Fritsch testified that he had done the calculations personally and he had personal knowledge of how the travel department produced its numbers. Fritsch believed that the accounting department had the receipts for freight and installation costs to replace the defective menu boards and testified that there should be check stubs evidencing payments.

{¶ 19} Fritsch also testified that he had investigated "a little" the option of stripping off the defective paint and trying to repaint the product as it was. Stratacache decided this was not a viable option because of the cost of stripping this type of paint, purchasing new paint, and the labor hours to apply the new paint.

{¶ 20} Ralph Idems testified next. Tr. 230-250. He was a self-employed consultant who had prior experience with powder coated products from as early as 1989 through 1995, when the company he worked for at that time was powder coating advertisement boxes on bus shelters. He explained that if the powder coating process was not performed properly, the powder may not adhere to the metal. Idems opined that the powder coating on the outdoor menu boards should have had at least a ten-year design life. He described a catastrophic paint failure as one in which the coating completely delaminates from the parent material. Idems visited FabMetals in September 2017 as a result of complaints raised by Civiq about catastrophic paint failures on some parts received from FabMetals. He discovered that FabMetals did not have good process control and did not appear to have any titration logbooks. Idems also stated that the cross

hatch testing was not as rigid and tightly controlled as he had expected it to be. Cross hatch testing was used to determine the quality of adhesion of a coating. According to Idems, FabMetals' process control was substandard compared to the powder coating industry's standards. Idems discovered that another customer of FabMetals had parts with a coating of oil on them. It alarmed Idems that very oily parts had been processed on the same production line as Stratacache's parts. Idems opined that FabMetals' failure to titrate their tanks resulted in excessive oil in the Stratacache production line.

{¶ 21} Hensley, a sales engineer at FabMetals, testified next. *Id.* at 253-364, 705-716. His job duties included quoting projects, overseeing the parts flow through the shop, creating and drawing some of the parts, and staying in contact with the customer. Hensley explained that FabMetals is a metal fabricator and a painter of metal parts. The pre-treatment production line at FabMetals consisted of five tanks: Tank 1 was an alkaline tank, Tank 2 was a wash tank using city water, Tank 3 was a tank with phosphate, Tank 4 was a rinse tank, and Tank 5 was a rinse and a sealer tank. The purpose of these tanks in the pre-treatment process was to clean metal products before they entered the dryer and the paint booth. Hensley testified that there would be paint adhesion issues if the metal parts were not thoroughly cleaned prior to painting. One of FabMetals' customers, Kreider, had oily parts that were being painted by FabMetals in September 2017 at the same time as it painted the parts for Stratacache.

{¶ 22} Hensley toured the Stratacache facility. He observed a poor assembly line in which the assembly personnel were clearly untrained and there were painted parts being slid across the floor. Hensley knew that the menu boards were going to be used

outdoors but did not understand that the finish specification was a requirement. He testified that, prior to the fulfilment of any purchase orders, he had told Stratacache that FabMetals did not use zinc phosphate. Before receiving the large Stratacache orders, FabMetals only painted about once per day. He stated that FabMetals did cross hatch quality testing, but the records reflecting these tests could not be located. FabMetals did not produce records regarding thickness checks and did not produce documents related to Tanks 2 and 4.

{¶ 23} One of the quality checks at FabMetals involved checking for a sheen after the metal was removed from Tank 5. Temporary employees sometimes conducted this visual testing. There were inspections and additional paint was added by paint guns as the metal parts passed through the painting process. Sometimes only one quality test was performed during an 11.5-hour period. Approximately 10-15% of the parts sent by FabMetals to Stratacache were powder coated.

{¶ 24} Hensley testified that the parts with adhesion problems that were delivered to Civiq in September 2017 were parts that never should have been included in the shipment to Stratacache. Rather, these were parts that had been quarantined and should not have been loaded onto the delivery truck.

{¶ 25} According to Hensley, it was industry practice for customers to pay for parts and materials when orders were canceled prior to delivery. Hensley testified that FabMetals was seeking the following damages from Stratacache in addition to the amounts on the unpaid invoices: $6,375 for labor to load parts for which Stratacache had not accepted delivery, $1,800 per month for the building in which parts were stored, $140

or $150 per month for each trailer that was rented, and prejudgment interest.

**{¶ 26}** Hensley believed that Stratacache was lying about its damages and had inflated its costs. He stated that FabMetals could get the same replacement parts for less than what Stratacache estimated. During his testimony, Hensley identified a few replacement parts in Stratacache's damages calculation that he believed reflected prices well above the market price.

**{¶ 27}** George Hurd, a quality consultant at Stratacache, testified next. Tr. 365-458. His first day working at Stratacache was May 1, 2017. He had spent the 3.5 years before trial analyzing the menu board problems involving FabMetals. He had visited FabMetals with Fritsch in September 2017. They met with Mark Hensley and Darrin Fultz. He also visited FabMetals in October 2017 and in February 2018. Stratacache expected FabMetals to do the corrective action items that were laid out by Stratacache.

**{¶ 28}** The first field complaint received by Stratacache involving paint adhesion issues occurred in February 2018. The subsequent replacement efforts were cumbersome. FabMetals was the only paint provider for Stratacache that provided parts with catastrophic paint peeling. There were 330 units made during the hot zone from August 23 through September 15, 2017, which included 176 single menu boards and 154 double menu boards. The hot zone dates were determined by using the information received from customer complaints. According to Hurd, Stratacache's customers that were in possession of rusted menu boards wanted the menu boards replaced.

**{¶ 29}** Kevin McGree, the Chief Financial Officer of Stratacache, also testified. Tr. 523-543. He testified regarding Stratacache's damages as reflected in Trial Exhibit

UUUU. He noted that Exhibit UUUU set forth $2,751,174 reflecting payments to FabMetals for all painted parts through September 2017. This number was derived from Stratacache's accounting records. McGree further testified that the remainder of the dollar amounts shown in Exhibit UUUU were taken from Fritsch's spreadsheet on damages, which was Exhibit TTTT. McGree explained that there was a double counting of $865,157 that needed to be removed from the original version of Trial Exhibit TTTT. Fritsch discovered this duplication. Once that duplication was removed, Stratacache's total damages were $5,647,112.

{¶ 30} Nicholas Liberto, a powder coating consultant, also testified at the trial. Tr. 545-609. He had considerable experience in the powder coating industry. The bulk of his business involved helping companies improve their powder coating or fixing problems with the powder coating. He authored an expert report and opined that all the parts painted by FabMetals were unreliable and subject to adhesion failure. He expressed mid-90% confidence in his opinion. Liberto explained at trial that "[i]f they haven't failed already, they're going to fail sooner or later." His examination of the situation was based on his review of photographs of the defective painting rather than investigations in the field.

{¶ 31} Liberto noted that the Stratacache specifications called for the use of zinc phosphate rather than iron phosphate. There was a 50% difference between these two in terms of corrosion performance. The primary purposes of using powder coating were to make the finished product look better and to delay corrosion.

{¶ 32} One of the reasons Liberto knew something went wrong in FabMetals'

processes was there was wholesale adhesion failure rather than a smaller, blister failure. According to Liberto, either the substrate was not properly cleaned, the conversion coating was not properly applied, or the powder coating was not properly cured. Liberto noted that Derek St. Cyr, FabMetals' lead painter, had not received formal training related to the pre-treatment process for powder coating.

{¶ 33} Based on his review of the evidence, Liberto believed that FabMetals had engaged in haphazard dumping of the water tanks and had failed to conduct chemical checks three times per day. He opined that the failures in the paint adhesion were not due to Stratacache's assembly, because powder coating has remarkable flexibility, and this was not a failure due to cracking. Rather, the paint coating never firmly bonded to the surface.

{¶ 34} John Darrin Fultz testified next. Tr. 622-675. He was the quality manager at FabMetals from approximately 2013 until 2019. He testified that he received an email from George Hurd, a representative of Stratacache, who wanted to know why FabMetals had sent him five pieces with defective paint in September 2017. Trial Exhibit F was a September 14, 2017 "Corrective and Preventive Action Request" completed by Fultz. In that document, Fultz stated that the root cause of the adhesion issues in the powder coated parts sent to Stratacache was "excessive oil in line. Tried to keep line running longer than we should have to meet customer demand." Under the section of the request entitled "Action Taken To Prevent Recurrence," Fultz stated that "[w]e told our customer that was bringing oily parts for us to powder coat to find a different supplier. Also, will use data sheet to monitor cleaner/phosphate/sealer three times a day." During cross-

examination by opposing counsel and then questioning from the trial judge, Fultz contradicted his prior deposition testimony. The trial judge subsequently stated that he believed Fultz had committed perjury.

{¶ 35} Terry Weese also testified at trial. Tr. 676-683. He was the director of purchasing with Stratacache and reported to Dave Fritsch. He testified that Ralph Idems visited FabMetals with Josh Hellstrom before Stratacache issued any purchase orders to FabMetals.

{¶ 36} Derek St. Cyr, a painter at FabMetals, also testified at trial. *Id.* at 731-770. He was the supervisor of painting for FabMetals in 2017. He became the supervisor of painting after receiving on-the-job training and attending a two-day painting class. However, the painting class did not involve the pre-treatment process for powder coating.

{¶ 37} St. Cyr checked the five tanks on the pre-treatment line after arriving at work each morning. St. Cyr conducted a visible check of Tank 2 and dumped it when needed. St. Cyr did not fill out the chemical test forms until Stratacache began requiring them in September 2017. Pursuant to Stratacache's request, Fultz told St. Cyr that he needed to keep better records relating to the wash system. St. Cyr recalled that Kreider was a customer of FabMetals that had stamped, oily parts.

{¶ 38} After September 2017, St. Cyr tried to keep better records of tests done on the tanks unless he got sidetracked. He testified that Scott Coate, a salesperson and formulating chemist employed by Solutions Plus, Inc., which provided FabMetals with its chemicals, visited FabMetals a few times per month. Solutions Plus provided pre-printed forms on which the results could be recorded. St. Cyr stated that he sometimes

conducted tests without recording the information on the forms.

**{¶ 39}** Coate also testified at trial. Tr. 774-801. He stated that he visited FabMetals one or two times per month. He recalled that FabMetals processed a number of oily parts. He explained that how often Tank 1 at FabMetals should be dumped depended on the amount of usage and the contamination levels. Coate opined that Tank 2 should have been dumped at least every other day or more often depending on the amount of contamination. Coate had not set up FabMetals' pre-treatment process specifically for Stratacache's parts.

**{¶ 40}** Following the bench trial, the parties submitted briefs in lieu of closing arguments. On July 13, 2021, the trial court issued its decision. The court noted that Liberto, an expert in powder coating who testified on behalf of Stratacache, concluded that the lack of an adequate process control method at FabMetals, along with a failure to execute the finishing process, had led to the adhesion failures at issue in the lawsuit. Decision (July 13, 2021), p. 3. The court explained that Liberto had examined several damaged units and had concluded that all 330 units fabricated and painted by FabMetals between August and September 15, 2017, would eventually have similar catastrophic paint failure and would have to be replaced. The trial court then stated that no testimony rebutted Liberto's opinion regarding future losses. *Id.* While the trial court acknowledged that Derek St. Cyr, Mark Hensley, and John Darrin Fultz had all testified that FabMetals' powder coating and cleaning processes were appropriate, the court pointed out that all records that could have verified these processes had "vanished" and that "Fultz perjured himself on the witness stand and his testimony, and that of the other two witnesses on

the subject, had no credibility." *Id.* at 3-4.

{¶ 41} Based on the evidence presented at trial, the court concluded:

The evidence is clear and unambiguous; from a period in August and September 2017 (up to September 15) FabMetals, Inc. was the sole painter of Stratacache's 330 digital signs. The paint on the digital signs failed, or will fail, because of a failure of FabMetals to paint the signs in a workmanlike manner, causing economic damages to Stratacache. As previously found, the direct evidence of the sign's failure is the signs themselves (Ex KKK), the testimony of Nicholas Liberto and the admission of FabMetals that it caused the defect (Ex F). The circumstantial evidence leading to the conclusion of a failure of the workmanlike duty is the evidence of the failure of the product that was exclusively handled and painted by FabMetals between August and September 2017. There is no other possible cause of the paint failures than FabMetals' lack of an appropriate paint process control.

*Id.* at 5.

{¶ 42} The trial court then analyzed the appropriate amount of damages to award. The court found that the information contained in Trial Exhibit XXXX relating to the defective signs was supported by credible evidence and previous stipulations and that Trial Exhibit TTTT was a credible spreadsheet depicting Stratacache's damages divided into five categories with a cutoff date of September 15, 2017. Decision, p. 6. Based on this evidence, the court found that the damages proximately caused by FabMetals' failure

to paint 330 units in a workmanlike manner was $5,647,112. However, the trial court noted that Stratacache had not paid $3,285,841.70 in invoices billed by FabMetals. The court stated that "If there are non-defective units on the unpaid invoices, they should be paid by Stratacache and deducted from the total damages owed to Stratacache." The court then instructed the parties "to do the calculations and report back by stipulation within two weeks of this decision." *Id.*

{¶ 43} Finally, the trial court noted its concern with Stratacache receiving a possible windfall if not all 330 units were replaced. The court suggested a procedure whereby FabMetals would pay the entire damage amount into a fund and Stratacache would withdraw only those amounts going to replacements that actually occurred. And "[i]f, after five years (or such other time agreed) not all 330 units need to be replaced, any money left over in the fund will be returned to FabMetals." *Id.* at 6-7. However, the trial court stated that it did not have the power to order such a procedure and noted that it was only a suggestion. *Id.* at 7. The parties did not adopt such a procedure.

{¶ 44} On September 10, 2021, the parties filed a stipulation with the court that provided, in relevant part: "The invoices totaling $3,285,841.70 are for individual parts (as opposed to units themselves); however, with that noted the invoices making up the $3,285,841.70 do not include parts fabricated and painted from August to September 15, 2017 that were used to assemble the 330 defective units." Both parties noted that they were not waiving any of their rights to contest whether either party was entitled to damages.

{¶ 45} On September 17, 2021, FabMetals filed a petition for bankruptcy in the

United States District Court for the Southern District of Ohio, which triggered an automatic stay. On October 25, 2021, the bankruptcy court modified the automatic stay in order to allow the Montgomery County Common Pleas Court to issue a final, appealable judgment in this action between Stratacache and FabMetals.

{¶ 46} On January 21, 2022, FabMetals filed a motion to supplement its post-trial brief to address damages issues. On July 12, 2022, the trial court issued a "Supplemental Decision and Ruling on Motions." The court noted that FabMetals, after hiring new counsel, was attempting to re-litigate the issue of damages. The trial court explained that it would consider the stipulation entered by the parties that the court had specifically requested in its July 13, 2021 Decision. The trial court then concluded that Stratacache "has proved by a preponderance of the evidence that it has been damaged in the amount of $5,647,112 as a proximate cause [sic] of [FabMetals'] failure to perform its contract in a workmanlike manner. [FabMetals] has proved that it delivered non-defective products to [Stratacache] in the amount of $2,072,053 for which it has not been paid. The net amount due [Stratacache] is $3,575,059." The court then requested that the parties file a proposed judgment entry reflecting this decision.

{¶ 47} Pursuant to the trial court's instructions, Stratacache filed a proposed final judgment entry. FabMetals then filed a motion for clarification and notice of objection to the proposed final judgment entry. On August 24, 2022, the trial court overruled the motion for clarification.

{¶ 48} The trial court entered a final judgment on November 18, 2022, awarding $3,575,059 to Stratacache and ordering FabMetals to pay the costs of the action.

FabMetals filed a timely notice of appeal from that judgment.

II.     A Portion of the Trial Court's Award of Damages to Stratacache Was Against

the Manifest Weight of the Evidence

{¶ 49} FabMetals' first assignment of error involves the trial court's calculation of

damages that were incurred by Stratacache.  FabMetals states:

THE TRIAL COURT ERRED BY AWARDING ALL THE DAMAGES

DEFENDANT-APPELLEE STRATACACHE SOUGHT.

{¶ 50} "The appropriate standard of review when reviewing a determination of

damages is manifest weight of the evidence"  *Langenfeld v. Hard Working Young Men,*

*LLC*, 5th Dist. Stark No. 2019CA00030, 2019-Ohio-4567, ¶ 9, citing *Oldendick v. Crocker*,

2016-Ohio-5621, 70 N.E.3d 1033, ¶ 56 (8th Dist.).  "Weight of the evidence concerns 'the

inclination of the *greater amount of credible evidence*, offered in a trial, to support one

side of the issue rather than the other.' "  (Emphasis sic.)  *Eastley v. Volkman*, 132 Ohio

St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins*, 78 Ohio

St.3d 380, 387, 678 N.E.2d 541 (1997).  "Weight is not a question of mathematics, but

depends on its effect in inducing belief."  *Id.*  In determining whether a verdict is against

the manifest weight of the evidence, an appellate court reviews the entire record, weighs

the evidence and all reasonable inferences, considers the credibility of witnesses, and

determines whether, in resolving conflicts in the evidence, the fact-finder clearly lost its

way and created such a manifest miscarriage of justice that the conviction must be

reversed and a new trial ordered.  *Id.* at ¶ 20.  When a court of appeals determines that

a verdict is against the weight of the evidence, it should remand the cause for a new trial. *Id.* at ¶ 22, citing *Hanna v. Wagner*, 39 Ohio St.2d 64, 66, 313 N.E.2d 842 (1974). "App.R. 12(D), in conjunction with Civ.R. 42(B), authorizes a Court of Appeals to order the retrial of only those issues, claims or defenses the original trial of which resulted in prejudicial error, and to allow issues tried free from error to stand." M*ast v. Doctor's Hosp. N.*, 46 Ohio St.2d 539, 541, 350 N.E.2d 429 (1976).

{¶ 51} The discretionary power of an appellate court to grant a new trial is to be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, citing *Thompkins* at 387. We make every reasonable presumption in favor of the judgment and any finding of facts; if the evidence is susceptible of more than one construction, we are bound to interpret it in favor of the fact-finder's ruling. *Eastley* at ¶ 21, citing *Seasons Coal Co. Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3.

{¶ 52} "Contract damages are intended to place the injured party in the same position it would have been had the contract not been breached." (Citation omitted.) *Eckel v. Bowling Green State Univ.*, 2012-Ohio-3164, 974 N.E.2d 754, ¶ 59 (10th Dist.). The party seeking damages bears the burden of proving damages. *Broadvue Motors, Inc. v. Maple Hts. Chief of Police*, 135 Ohio App.3d 405, 410, 743 N.E.2d 417 (8th Dist.1999). "Damages cannot be awarded if the [party] fails to meet this burden by presenting adequate proof." *Id.*, citing *Henderson v. Spring Run Allotment*, 99 Ohio App.3d 633, 641, 651 N.E.2d 489 (9th Dist.1994). "Evidence of damages must be shown

with a reasonable degree of certainty," and a party "may not recover speculative damages." (Citation omitted.) *Id.* The party "must prove the extent of his damages to be entitled to compensation." *Id.*, citing *Akro-Plastics v. Drake Industries*, 115 Ohio App.3d 221, 226, 685 N.E.2d 246 (11th Dist.1996).

{¶ 53} The parties and the trial court addressed Stratacache's breach of contract claim as a breach by FabMetals of its duty to perform in a workmanlike manner. "Ohio common law imposes upon builders and contractors a duty to perform their services in a workmanlike manner." (Citations omitted.) *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, 878 N.E.2d 66, ¶ 19 (10th Dist.). "This implied duty 'requires a construction professional to act reasonably and to exercise that degree of care which a member of the construction trade in good standing in that community would exercise under the same or similar circumstances.' " *Id.*, quoting *Seff v. Davis*, 10th Dist. Franklin No. 03AP-159, 2003-Ohio-7029, ¶ 19. "When a builder or contractor breaches its implied duty to perform in a workmanlike manner, the cost of repair is the proper measure of damages." (Citations omitted.) *Id.* " '[T]he repair of deficient work may involve both additional activities necessitated by the deficient work, and activities previously omitted, but necessary, to proper performance in a workmanlike manner.' " *Id.*, quoting *Barton v. Ellis*, 34 Ohio App.3d 251, 254, 518 N.E.2d 18 (10th Dist.1986).

{¶ 54} Based on the purchase orders submitted by Stratacache to FabMetals and the nature of what was ordered, the contractual relationship between FabMetals and Stratacache appeared to be a contract for the sale of goods, which is governed by Ohio's version of the Uniform Commercial Code, R.C. 1302.01, et seq. "For a sale of goods, if

the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may reject the whole, accept the whole, or accept any commercial unit or units and reject the rest." *Anixter, Inc. v. Rohr Corp.*, 1st Dist. Hamilton No. C-030690, 2004-Ohio-3623, ¶ 9, citing R.C. 1302.60. "If the goods do not conform to the contract, the buyer can recover the difference between the contract price and the cover price, plus incidental damages and consequential damages, less expenses saved in consequence of the seller's breach." *Id.* at ¶ 10, citing *Freitag v. Bill Swad Datsun*, 3 Ohio App.3d 83, 443 N.E.2d 988 (10th Dist.1981). "Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation, and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses, or commissions in connection with effecting cover, and any other reasonable expenses incident to the delay or other breach." *Id.*, citing R.C. 1302.89(A). "Incidental and consequential damages only involve curing or replacing defective goods" and "do not involve replacing other functioning products." *Id.* at ¶ 13, citing R.C. 1302.89.

{¶ 55} Regardless of whether the trial court should have analyzed damages under a breach of an implied duty to perform a service in a workmanlike manner or as a breach of a contract for the sale of goods, the focus of contract damages is on placing the injured party in the position it would have been if the breaching party had performed its duty. The trial court awarded $3,575,059 in damages to Stratacache as the amount that was required to place Stratacache in the position it would have been if FabMetals had delivered non-defective parts.

{¶ 56} In making its determination, the trial court credited all of the damages that

Stratacache identified in Trial Exhibits OOOOO.5 and TTTT and then subtracted the amount of the invoices related to the parts FabMetals delivered for which Stratacache had refused to pay. Trial Exhibits OOOOO.5 and TTTT showed total damages of $5,647,112.00. This total was made up of the following: 1) $3,065,242 consisting of FabMetals Purchased Products ($2,751,174), Retrieval Costs of Freight ($22,386) and Installers ($27,662), and Lost Revenue from Retrievals ($264,020); and 2) $2,581,870 consisting of tooling costs for 6 teams ($20,063.58), total cost for field checks and prep ($154,956.23), retrieval cost for labor and freight ($632,295.30), total cost to replace painted parts ($909,398.38), and cost of down time at the Stratacache facility ($865,157.00).

{¶ 57} FabMetals contends that the trial court erred in several ways in awarding all of the damages that Stratacache sought. We will address each of these arguments in turn. But before we do so, it is necessary for us to address Stratacache's argument made throughout its appellate brief that FabMetals waived many of the issues it raises in this assignment of error by not objecting to evidence introduced at trial and by stipulating to the use of summary evidence pursuant to Evid.R. 1006.

{¶ 58} The fact that FabMetals may or may not have objected to the introduction of exhibits and testimony at trial does not function as a complete waiver of all arguments relating to whether Stratacache adequately supported its claims for damages. Rather, a failure to object at trial to the admission of evidence would just limit FabMetals' ability to question on appeal whether that particular evidence should have been excluded from evidence at trial. Further, any failure by FabMetals to adequately cross-examine

Stratacache's witnesses who testified relating to damages, while constituting a lost opportunity to explore potential weaknesses in Stratacache's evidence of damages, does not preclude FabMetals on appeal from challenging whether Stratacache carried its burden of proof on damages. Along these same lines, the stipulation entered into by the parties allowing for the use of summary evidence under Evid.R. 1006 precludes FabMetals from challenging on appeal whether the use of summary evidence was proper under Evid.R. 1006. However, the stipulation does not preclude FabMetals from arguing on appeal that Stratacache's damages calculations were inaccurate, Stratacache was not entitled to some of those damages, or that Stratacache failed to lay the proper foundation for the witness testifying regarding those damages. With that in mind, we will now consider FabMetals' arguments that the trial court should not have awarded some of the damages Stratacache requested.

**{¶ 59}** First, FabMetals contends that the trial court erred in awarding a refund for all of the painted parts provided by FabMetals during the hot zone despite the fact that only two of the 21 parts provided by FabMetals for the outdoor boards were defective. According to FabMetals, "there is no basis in the record for refunding more than the back panels' purchase price: $125,875.95." Appellant's Brief, p. 16, citing Trial Exhibit TTTT, Tab 11. Stratacache responds that its expert witness, Liberto, testified that all FabMetals painted parts were unreliable and subject to adhesion failure and that Fritsch testified that Stratacache was unable to use any FabMetals parts following its discovery of the reliability issues. Appellee's Brief, p. 9-10, citing Tr. 118, 595.

**{¶ 60}** Fritsch testified at trial that he had investigated the option of stripping off the

defective paint and trying to repaint the product. Stratacache decided this was not a viable option because of the cost of stripping this type of paint, purchasing new paint, and the labor hours to apply the new paint. Further, Fritsch testified that the removal of certain parts from the assembled menu boards was a destructive process that would not allow just the defective parts to be replaced while allowing the non-defective parts to be used. In particular, Fritsch testified that:

> [Y]ou can't really replace, even in-house, just the back panel. The way that we put it together and it's riveted together and everything is glued together on the seams to make it watertight for outdoor use, when you take the back panel off, the way it - - the top comes over, you have to un - - you have to actually drill out the rivets. You have to undo - - a lot of the components are wrapped around it, and since it destroys the side panels, when you are drilling everything out and pulling those off, you - - you then a lot of times will have to wrap around to the front to pull the side panels off. In most cases, when you're going to repair one of those, you're replacing pretty much the entire outside shell of that.

Tr. 103-104.

{¶ 61} George Hurd also testified that the whole unit had to be replaced due to FabMetals' defective work. *Id.* at 451-452. Therefore, the trial court's decision to not limit damages to just the cost of replacing the two defective powder coated parts on each defective menu board was not against the manifest weight of the evidence.

{¶ 62} Next, we will address FabMetals' second and sixth issues together because

they both concern the idea that the trial court awarded duplicative damages to Stratacache. In its second issue, FabMetals contends that the trial court improperly awarded a double recovery to Stratacache by ordering the refund of the purchase price while also awarding replacement costs. According to FabMetals, the trial court's award allows Stratacache to pay nothing, not even the contract price, for the parts, because the award gave Stratacache both the purchase price and cover costs. Appellant's Brief, p. 16; Reply Brief, p. 4.

{¶ 63} Stratacache responds that FabMetals misunderstands the calculation of damages. Stratacache states that the $909,398.38 for "Total Cost to Replace" were the costs that Stratacache must incur in addition to the $2,751,174 refund amount in order for Stratacache to rebuild and replace the 330 defective outdoor display menu boards. Appellee's Brief, p. 10, citing Tr. 497, 502. As Stratacache argues, "[i]t defies logic that $909,398.38 would be enough to compensate Stratacache for the replacement of over $2.5 million in defective parts, the cost of which has increased in the intervening years." *Id.* at 10-11.

{¶ 64} In its sixth issue, FabMetals argues the trial court erred in awarding $154,956.23 in inspection costs when it had already been decided that all of the displays would be replaced. In other words, "no one needs to inspect displays for signs of failure." Appellant's Brief, p. 21. Stratacache responds that "[e]ven though Stratacache will be replacing each faulty ODMB, it must send inspection teams to each site to perform quality checks, assess damage, coordinate removal requirements and logistics, and evaluate environmental concerns — all of which requires time, expertise, and money." Appellee's

Brief, p. 17.

{¶ 65} As we noted above, in determining the proper amount of damages, the goal is to place the injured party in the position it would have been if the breaching party had fully performed under the contract. Given that guideline, we do not agree with FabMetals that the trial court *necessarily* awarded a double recovery or put Stratacache in a better position than it would have been by awarding both the damages labeled "Fab Metal Purchased Products" and "Total Cost to Replace" in Exhibits OOOOO.5 and TTTT. The $2,751,174 identified as "Fab Metal Purchased Products" represented the amount FabMetals had paid for the defective menu boards. Therefore, this amount was the refund of the purchase price. However, the trial court also awarded an additional $909,398.38, which allegedly constituted the money in addition to the refund amount that Stratacache would need in order to buy the replacement powder coated parts to assemble the replacement menu boards for its customers. This was based on Fritsch's testimony that Stratacache needed an additional $909,398.38 due to the increase in costs for parts that occurred between the time of breach and the time the replacement costs were calculated. Presumably, Stratacache would then use this money to purchase the replacement menu boards for its customers. Therefore, Stratacache would not be keeping the "refunded" amount. Rather, Stratacache would be paying the total of $3,660,572.80 to a third party to make and provide the replacement, non-defective parts that FabMetals had been contractually obligated to provide but did not. This idea is referred to as the cover cost. As such, we cannot conclude that the trial court necessarily provided a double recovery to Stratacache. However, that does not end our analysis of

these two issues.

{¶ 66} Fritsch also testified about the alleged need to send inspection teams to customer sites in addition to the teams that were going to remove the defective menu boards and install the replacement menu boards. Tr. 513-518. According to Fritsch, the inspection teams would go through a quality checklist provided by George Hurd, which would include cross hatch testing to determine whether the menu board "was potentially going to catastrophically fail due to a failed adhesion test." *Id.* at 517. He stated the following when asked about units that did not need to be removed:

Q.      And if units don't need to be removed, what do they do?

A.      There's still going to - - I mean, they're still going to check all the units on the site. If it doesn't need to be removed, it doesn't. But in most cases, I can tell you there's - - from what we've seen, at least one of them on site, and we've already had some of the customers tell us they want all of them removed.

*Id.* at 515.

{¶ 67} Fritsch's testimony was direct evidence that Stratacache was not automatically replacing all 330 of the defective menu boards in the field. Rather, Stratacache appeared to be only replacing those menu boards that showed clear visible signs of adhesion failure, failed the cross hatch test, or the customer affirmatively stated it wanted replaced. This testimony by Fritsch supported the concern the trial court noted in its July 13, 2021 decision that Stratacache would receive a windfall if it ultimately does not replace some of the 330 menu boards at issue in this lawsuit. At the time of trial,

Stratacache had only replaced 14 menu boards in a little over three years since discovering the powder coating defects in early 2018. Presumably, the over 300 menu boards that had not yet been replaced at the time of trial were still operating in the field at several quick-service restaurant locations. As such, Stratacache (and its quick-service restaurant customers) continued to receive value from the parts, even the defective ones, supplied by FabMetals. No testimony was presented that the defective menu boards did not work for their intended purpose of providing information to the customers in the drive-thru lanes at McDonald's. To the contrary, George Hurd testified on behalf of Stratacache that the paint issue was a "strictly cosmetic" issue because the peeling of the paint did not affect the operation of the unit itself. Tr. 409.

**{¶ 68}** We note that FabMetals did not submit any expert testimony in response to Liberto's testimony that the powder coating would fail eventually or any testimony in response to Stratacache's evidence that corrosion would eventually result from the powder coating failures. Therefore, it is clear that Stratacache suffered some damages due to the defective parts provided by FabMetals. But Liberto's expert testimony did not resolve the issue of whether Stratacache proved that it was entitled to the refund of the entire amount paid to FabMetals plus the additional $909,398.38 for the price of replacement parts that allegedly exceeded the original contract price with FabMetals. Stratacache was only entitled to the amount of damages that it could prove to a reasonable degree of certainty. Any damages already incurred to replace defective menu boards and any damages that will actually be incurred to replace defective menu boards should be awarded to Stratacache. But the record does not support the trial court's award

of damages based on the assumption that all of the menu boards will actually be replaced. At this point, over six years have passed since the first complaint was reported by a McDonald's location. The testimony of record established that a non-defective menu board has a design life of at least ten years. Ten years from the date the parts were made and painted would be September 2027. If only a minority of menu boards have been replaced to this point, then Stratacache and a majority of its quick-service restaurant customers have received working menu boards for over one-half of the expected design life of the menu boards. Further, if *any* of the remaining quick-service customers decide not to replace the menu boards or choose to switch to and pay for a newer menu board offered by Stratacache, then Stratacache would receive a windfall if we were to affirm the trial court's judgment. Although Fritsch testified that Stratacache planned to replace all the menu boards made during the hot zone, his testimony also made it clear that not all the menu boards made during the hot zone were being replaced. Upon this record, we must conclude that the trial court's award of damages based on the premises that all the defective menu boards will be replaced and that Stratacache received no value from the defective menu boards was against the manifest weight of the evidence.

{¶ 69} Regarding the claims by Stratacache that replacement parts cost more now than at the time Stratacache paid FabMetals for the original parts, Fritsch testified that he sought multiple quotes on what it would cost to have another supplier make the identical powder coated parts that FabMetals failed to properly make. Hensley reviewed the estimates provided by Fritsch and testified on behalf of FabMetals that these additional amounts Stratacache sought were excessive and that he could call several providers that

would quote much lower costs. While Hensley admitted that costs of certain parts had risen since 2017, he believed Stratacache's numbers were unnecessarily inflated. We note that the trial court found Hensley was not credible on the issue of liability. While this does not necessarily mean Hensley also lacked credibility on the issue of damages, we conclude the trial court's finding that the cost of the parts necessary to replace the menu boards will exceed the original contract price for the parts was not against the manifest weight of the evidence. Fritsch laid out the actual estimates he received to replace the menu boards at issue. Hensley, on the other hand, just testified generally that he believed some of the estimates were inflated and that he could find lower estimates. We agree with the trial court that Stratacache should be entitled to the additional cost to replace the defective menu boards that resulted from the fact that the prices of the necessary parts have increased since 2017.

{¶ 70} Further, while we agree with FabMetals' basic premise that the award of damages for the use of inspection teams does not make sense if all the menu boards are eventually going to be replaced anyway, we believe the testimony provided by Stratacache explaining the reason for using the inspection teams makes sense, especially if inspections have alleviated the need to replace a number of the outdoor menu boards at issue. Therefore, we conclude that the trial court's award of $154,956.23 in inspection costs to Stratacache was not against the manifest weight of the evidence.

{¶ 71} Having found that the amount of damages awarded to Stratacache to replace the defective menu boards was against the manifest weight of the evidence, the issue becomes how the trial court should proceed on remand. As noted above, a new

trial is the relief typically granted when a verdict is against the manifest weight of the evidence. In *Akron & Barberton Belt RR. Co. v. Horvath*, 9th Dist. Summit No. 12203, 1986 WL 4878 (Apr. 23, 1986), the court of appeals concluded there was "not a total lack of evidence with respect to the claimed damages," but that the evidence on damages fell "short of the requirements of Ohio law." *Id.* at *2. In this regard, the court stated:

> There is present in the trial transcript testimony on behalf of the appellee relating to his profits and to his expenses. However, in the opinion of this court, the detailed specification of labor costs, material and equipment costs, and an estimate as to the time required to complete the Fairlawn Branch project are not clearly presented. These should be supported by evidence, based on a reasonable certainty, in a manner which would allow the jury to render an intelligent, logical, and rational assessment of damages which would reasonably compensate appellee for the appellant's failure to allow appellee to work on the Fairlawn Branch project under the terms of their agreement.

> We hold, therefore, that the amount of the damages which resulted from the appellant's breach of contract are uncertain, but that the fact that they are uncertain does not invalidate the judgment in favor of appellee. We further hold that in returning a verdict on the liability issues in favor of appellee, substantial justice has been rendered.

*Id.* The court, therefore, vacated the jury's damage award and remanded the case for a new trial on damages, the only issue as to which there was prejudicial error. *Id.* at *3.

{¶ 72} Similarly, in this case, Stratacache has proven that FabMetals is liable and that Stratacache suffered damages resulting from FabMetals' provision of defective parts, but it did not establish with a reasonable degree of certainty the extent of its damages. Therefore, we will remand the cause to the trial court to conduct a new trial to determine the amount of damages Stratacache (1) has incurred with respect to defective menu boards that have already been replaced; and (2) will incur with respect to defective menu boards that will actually be replaced by September 2027, the month in which the menu boards finish the tenth year of their design life.

{¶ 73} In its third issue within this assignment of error, FabMetals argues that the trial court erred in awarding $264,020 in lost revenue because there was no testimony as to how this number was calculated and no proof offered of expenses and profit margin. According to FabMetals, no witness identified the prices customers paid Stratacache for the displays, no witness testified that Stratacache would have sold more displays but for having to retrieve the 14 displays at issue, and no witness accounted for expenses and profit margin. Appellant's Brief, p. 17. Further, FabMetals points out that the outdoor menu board project at issue in this case was a new business line for Stratacache and such new or speculative business pursuits generally require greater proof in order to award damages. *Id.*

{¶ 74} Stratacache responds that the $264,020 the trial court awarded it for lost revenue damages represented damages already incurred by Stratacache at the time of the trial due to the fact Stratacache was forced to provide two outdoor menu boards to certain customers for the price of one. According to Stratacache, FabMetals' failure to

object or raise an issue at trial over McGree's testimony about lost revenue waived the argument on appeal.

{¶ 75} We agree with FabMetals that the trial court's award of $264,020 for lost revenue damages was against the manifest weight of the evidence. There was no testimony as to how this number was calculated and no proof offered of expenses and profit margin. Stratacache did not identify the prices that customers paid Stratacache for the outdoor menu board displays, and no witness accounted for expenses and profit margin. "Although lost profits need not be proven with mathematical precision, they must be capable of measurement based upon known reliable factors without undue speculation." (Citation omitted.) *Telxon Corp. v. Smart Media of Delaware, Inc.*, 9th Dist. Nos. 22098, 22099, 2005-Ohio-4931, ¶ 108. Further, the trial court awarded damages for the replacement of all parts necessary to replace the 330 menu boards made during the hot zone. Presumably, the location at issue in this $264,020 award was one of the 95 locations identified at trial that was affected by the defective parts made during the hot zone, and therefore Stratacache had already been awarded damages to cover the replacement of the defective menu board at that particular location. During the new trial on damages related to the cost to replace the defective menu boards, however, Stratacache should be permitted to introduce evidence related to lost revenue damages. Similarly, FabMetals should be permitted to introduce evidence related to revenue Stratacache received from the defective menu boards.

{¶ 76} In its fourth and fifth issues, FabMetals takes issue with the labor rates claimed by Stratacache. In its fourth issue, FabMetals states that the trial court erred in

awarding $100 per hour for labor without any testimony from anyone with personal knowledge of the labor rates and why the rates jumped from just over $50 per hour to $100 per hour. According to FabMetals, Stratacache failed to meet its burden of proof by offering inconsistent labor rates and not offering a witness with personal knowledge to explain how the labor rate was calculated.

{¶ 77} Stratacache responds that FabMetals is essentially arguing that all the underlying evidence of the labor calculation needed to be introduced into evidence "even though FabMetals stipulated that Stratacache did not have to do that that and could rely upon only summary evidence." Appellee's Brief, p. 12. Further, Stratacache argues that the primary summary spreadsheet (Exhibit TTTT) contained plain and unambiguous calculations of Stratacache's labor rates, and that Fritsch testified on both direct and cross-examination regarding exactly how Stratacache calculated the amount of labor hours to rework defective outdoor display menu boards.

{¶ 78} In its fifth issue, FabMetals argues that the trial court erred in awarding $865,157 in damages for downtime when Stratacache continued to assemble displays during the alleged downtime and no one testified regarding the $100 per hour labor rate associated with this downtime. Stratacache responds that it was not required to present the documentation underlying its labor calculations when it was stipulated that Stratacache could rely upon and present only summary evidence. Appellee's Brief, p. 14. Further, Stratacache points out that Fritsch provided testimony explaining the summary evidence and establishing that an extensive shutdown and investigation at Stratacache had occurred. *Id.* at 14-15.

{¶ 79} "Among the items for which a buyer aggrieved by the seller's breach of contract may recover from the seller, as consequential damages, provided that it is proven that they were caused by the seller's breach, are expenses for idle or down time, such as overhead expenses incurred while production is shut down because of defects in the goods, or while the buyer is attempting to repair the goods, or because of delay due to the seller's failure to deliver the goods on time."  (Citations omitted.)  24 Lord, *Williston on Contracts,* Section  66:70 (4th Ed.2023).  "Consequential damages for idle or down time are generally deemed to have been within the contemplation of the parties at the time of contracting.  Such damages have been allowed for the variable costs involved for labor, rental expenses for equipment or facilities, lost plant time, or lost production capacity, and for loss of income."  *Id.*

{¶ 80} Although Fritsch testified that a major investigation began at Stratacache in February 2018 over the cause of the catastrophic paint failure at a McDonald's location, no witness explained what orders or work Stratacache was unable to perform during this investigation.   If Stratacache ultimately did not lose out on any orders during the investigation, then Stratacache did not suffer any additional damages as a result of this "downtime."  It is reasonable to conclude from the evidence presented at trial, however, that a number of Stratacache's employees were diverted from their normal work in order to assist in the investigation of the adhesion failures in the field.  It would be proper to compensate Stratacache for the amount it actually paid the employees who were assisting in this investigation, since they were unable to do their normal work during this time.

{¶ 81} Fritsch did not testify that Stratacache actually paid its investigating employees $100 per hour during the investigation process. Rather, this $100 hourly rate appears to have built into it more than just the hourly rate paid to the employees who were investigating the cause and extent of the paint failures in the field. According to Tab 2 to Exhibit TTTT, Stratacache spent 8,651.57 hours of employee time from February through May 2018 investigating the cause and extent of catastrophic paint failures on the outdoor menu boards. This exhibit, however, did not lay out the actual hourly rate paid to the employees.

{¶ 82} George Hurd also testified about the lengthy investigation Stratacache performed once it began learning of adhesion failures in the field. During his testimony, Hurd referred to payroll records contained in Trial Exhibit CCC. These records showed a normal hourly rate of up to $18 an hour and some slightly higher overtime rates.

{¶ 83} Based on our review of the testimony and the exhibits introduced at trial, we must conclude that the trial court's finding that Stratacache suffered $865,157 in damages for downtime was against the manifest weight of the evidence. While Stratacache established that it suffered some downtime and some amount of resulting damages from this downtime, it failed to support its use of $100 as the proper hourly rate to be applied to the lost hours due to the downtime. Therefore, we must reverse the trial court's award of $865,157 in damages due to downtime. On remand, the trial court shall hold a new trial to determine the proper amount of damages to award Stratacache for the downtime that occurred when the cause of the defective parts was being investigated.

{¶ 84} In its seventh and final issue within this assignment of error, FabMetals

contends that it was not reasonably foreseeable that delivering one defective part like the back panel would require replacement of the entire product. According to FabMetals, while it was foreseeable that peeling paint could cause damages and require corrections, FabMetals did not know and had no reason to know that metal parts could not be repainted or replaced in the field on a fully functioning outdoor display menu board. In short, "[h]aving contracted only to provide metal parts, FabMetals did not know and had no reason to know that the displays would need to be removed and destructively disassembled to fix peeling exterior paint on a single metal part." Appellant's Brief, p. 22.

{¶ 85} Stratacache responds that FabMetals did not contest the foreseeability of Stratacache's damages whatsoever at trial and the argument is waived on appeal. Appellee's Brief, p. 17. Further, Stratacache argues that its damages were foreseeable because they were the natural and probable consequence of FabMetals' breach. According to Stratacache, the outdoor display menu boards were "constructed in such fashion that they cannot be repaired by only replacing back panels." *Id.* at 18.

{¶ 86} We do not find FabMetals' argument on this issue persuasive. Representatives of FabMetals and Stratacache met before Stratacache decided to send purchase orders to FabMetals. Stratacache explained that the parts made by FabMetals would be used for an outdoor menu board that would be assembled by another company. Given that information, it was reasonably foreseeable that the provision of defective parts with catastrophic paint failures could result in the need to replace the entire assembled menu board, especially when the increased likelihood of corrosion was involved.

{¶ 87} In summary, we will reverse the following awards of damages as against

the manifest weight of the evidence: $2,751,174 for "FabMetals Purchased Products," $909,398.38 for "Total Cost to Replace," $264,020 for "lost revenue," and $865,157.00 for "downtime." On remand, a new trial shall be held to determine the appropriate amount of damages for these categories. The other categories of damages awarded to Stratacache will be affirmed.

{¶ 88} The first assignment of error is sustained in part and overruled in part.

III.    The Trial Court Should Have Ordered Stratacache to Pay for All Non-Defective Goods It Had Ordered from FabMetals

{¶ 89} FabMetals' second assignment of error states;

THE TRIAL COURT ERRED BY FAILING TO AWARD DAMAGES TO PLAINTIFF-APPELLANT FABMETALS FOR COSTS IT INCURRED AND PARTS IT FABRICATED BUT WAS PREVENTED FROM DELIVERING.

{¶ 90} This assignment of error involves FabMetals' action on account relating to non-defective goods that were ordered by Stratacache but for which Stratacache never provided payment. The trial court found that the total amount Stratacache had ordered but failed to pay for was $3,285,841.70. After the parties submitted a stipulation, the trial court found that Stratacache was required to pay FabMetals for the $2,072,053 portion of these parts that FabMetals had delivered to Stratacache. The trial court did not order Stratacache to pay the remaining $1,213,788.70 for parts that were ordered and made but never delivered to Stratacache.

**{¶ 91}** FabMetals contends that the trial court erred in failing to award damages to it for parts it had produced for Stratacache pursuant to a purchase order but for which Stratacache had refused to accept delivery and to pay. It argues that, because Stratacache cancelled its purchase orders on December 9, 2017, before learning of adhesion failures occurring at its customers' locations, Stratacache should be responsible for both delivered and undelivered parts. Appellant's Brief, p. 23. FabMetals argues that, because the trial court awarded damages to FabMetals for the parts it delivered for which Stratacache did not pay, it also should have awarded damages for the parts that FabMetals had to store after Stratacache cancelled the contract. According to FabMetals, "There is no distinction. None of those parts (delivered or not) had anything to do with the 'hot zone,' and Stratacache had no reason — other than its own convenience — for rejecting them." *Id.* at 24.

**{¶ 92}** Stratacache responds that "FabMetals did not put on a case at trial for the additional damages it claims on appeal." Appellee's Brief, p. 19. Further, Stratacache contends that there is "a distinction between delivered parts and undelivered parts that FabMetals fails to acknowledge. For parts delivered to Stratacache, it arguably received some value even though they were not used. For parts that were never delivered, Stratacache received no value." *Id.* at 21. Stratacache also argues that FabMetals failed to mitigate its alleged damages related to the undelivered parts. According to Stratacache, "FabMetals could have mitigated its alleged damages, for instance, by disposing of the parts for at least scrap value, at any time, but it did not." *Id.* at 22.

**{¶ 93}** As we noted above, the parties filed a stipulation that the total unpaid

invoices totaling $3,285,841.70 did not include any parts fabricated and painted from August to September 15, 2017, that were used to assemble the 330 defective outdoor menu boards. We agree with FabMetals that Stratacache was responsible for paying for non-defective parts it had ordered but subsequently refused to accept or pay for. R.C. 1302.82.

**{¶ 94}** Stratacache raised failure to mitigate damages as an affirmative defense to FabMetals' claims. " 'It is a cardinal rule of contracts that an injured party is under a duty to mitigate its damages and may not recover those damages which it could have reasonably avoided.' " *Lucky Discount Lumber Co., Inc. v. Machine Tools of Am.*, 181 Ohio App.3d 64, 2009-Ohio-534, 907 N.E.2d 1222 (2d Dist.), ¶ 11, quoting *S & D Mechanical Contrs., Inc. v. Enting Water Conditioning Sys., Inc.*, 71 Ohio App.3d 228, 238, 593 N.E.2d 354 (2d Dist.1991). However, "[t]he rule requiring one injured by a wrongful act or omission of another to minimize the damages resulting does not require a party to make extraordinary efforts, or to do what is unreasonable or impracticable. Ordinary and reasonable care, diligence and prudence are the measure of the duty. * * * The efforts of the injured party to prevent or lessen [its] damages include a reasonable expenditure of money as part of [its] damages." (Citations omitted.) *Foust v. Valleybrook Realty Co.*, 4 Ohio App.3d 164, 168, 446 N.E.2d 1122 (6th Dist.1981). "[T]he obligation to mitigate does not require the party to incur extraordinary expense and risk." *Chicago Title Ins. Co. v. Huntington Natl. Bank*, 87 Ohio St.3d 270, 276, 719 N.E.2d 955 (1999), citing *S & D Mechanical Contrs., Inc.* "[A] risk is extraordinary if the hazard it presents is substantially greater than would otherwise exist, due to some particular and unusual

circumstance." *Lucky Discount* at ¶ 16.

**{¶ 95}** Stratacache did not introduce any evidence regarding the scrap value of the parts manufactured and stored by FabMetals or what efforts or costs would have been necessary to sell the parts for scrap. Therefore, we cannot conclude that FabMetals failed to mitigate its damages. Further, we note that FabMetals also raised an affirmative defense of failure to mitigate damages. The argument raised by Stratacache that FabMetals should have sold the undelivered parts for scrap would equally apply to Stratacache with regard to the defective menu boards that it removed from its customers. But, on the record before us, we must conclude that neither party established that the other failed to mitigate its damages by not selling the parts in their possession for scrap.

**{¶ 96}** The second assignment of error is sustained. FabMetals is entitled to an award of an additional $1,213,788.70 for the non-defective parts made by FabMetals for which Stratacache did not pay.

IV.    Conclusion

**{¶ 97}** Based on our resolution of the two assignments of error, we will affirm the judgment of the trial court in part, reverse the judgment in part, and remand the cause for a new trial on damages. As explained above, the trial court will need to hold a new trial to determine the proper amount of damages to award Stratacache relating to (1) the costs already incurred to replace defective menu boards; (2) the additional costs that will actually be incurred by September 2027 to replace defective menu boards; and (3) the damages resulting from the downtime at Stratacache that occurred during its investigation

over the cause of the defective menu boards. Further, the trial court shall award FabMetals an additional $1,213,788.70 for the non-defective parts made by FabMetals for which Stratacache did not pay. In all other respects, the judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and HUFFMAN, J., concur.